F I L E D

JAN 1 4 2008 *ow*

Jan 14, 2008

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

### IN THE UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

| | | |
|---|---|---|
| United States Of America | ) | Case No. 04-Cr-466 |
| Respondant | ) | Violations:18 U.S.C. section 922(g)(1) |
| v. | ) | Possession of a firearms by a felon & |
| Joseph Vansach | ) | 8 U.S.C. section 924(e) Armed Career |
| Defendant-Appellant | ) | Criminal Act |
| | ) | Honorable Judge Ruben Castillo |

*Motion To Vacate, Set Aside, or Correct*

*The Petitioner's Conviction And Sentence*

*Under 28 U.S.C. section 2255 Habeas Corpus*

*(petitioner is in federal custody)*

Now comes the petitioner, Joseph Vansach, with this petition to Vacate, Set Aside or Correct his conviction and sentence within that that Is allowed by the United States Contitution and within the limits allowed by the governing Laws. The petitioner, Joseph Vansach is in federal custody at United States Penitentiary Hazelton, in Bruceton Mills, West Virginla.

> Joseph Vansach (Pro Se)
> Reg. No. 17041-424
> United States Penitentiary-Hazelton
> P.O. BOX 2000
> Bruceton Mills, West Virginia 26525

# 08CV304
# JUDGE CASTILLO
# MAG. JUDGE ASHMAN

Question Presented

1) Was Mr. Vansach's Constitutional Rights Violated when the court allowed the government to constructively amend the charged one count indictment by removing the Armed Career Criminal Act before presenting it to the jury?

2) Was Mr. Vansach's Constitutional Rights Violated when federal authorities went outside their jurisdiction without ceding jurisdiction from the State of Illinois first?

3) Was Mr. Vansach's Constitutional Rights violated when the prosecutor used misconduct and a pejudicial closing argument based on false information being given to the trial jury?

4) Is the court allowed to take away several of your constitutional rights, because you requested to represent yourself at trial pro-se?

5) Was Mr. Vansach unconstitutionally sentenced over the statuary maximum sentence allowed by the jury's finding of guilt?

Υ î

## TABLE OF CONTENTS

*Questions Presented*     *(vi)*

*Table of Authorities*     *(v to i)*

*Opinions Below*     *(1)*

*Jurisdiction*     *(1)*

*Question # 1*     *(1)*

*Question #2*     *(7)*

*Question # 3*     *(13)*

*Question #4*     *(19)*

*Question #5*     *(21)*

*Conclusion*     *(25)*

*Table of Apprendix's*     *(26)*

Table of Authorities

Adams V. United States, 87 L.Ed. 1421, 319 (1943)                                      9,11

Alexander V. Beck, 660 F. 2d. 1240 "16 Envt. Rep. Cas. 2199, 11 ELR 21033" (1981, CA 8 Minn)    12

American V. Banana Company V. United Fruit Company, 213 U.S. 347, 357, 29 S.Ct. 511 (1909)    8

Apprendi V. NewJersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed. 2d. 435 (2000)          24

Bain V. United States, 121 U.S. 1, 30 L.Ed. 849, 7 S.Ct. 781 (1887                     1, 2, 6

Bell V. Ebvatt, 72 F. 3d. 421 (4th Cir. 1995)                                          15

Berger V. United States, 295 U.S. 78, 88 ,79 L.Ed. 1314, 55 S.Ct 629 (1935)            18

Blackledge V. Perry, 417 U.S. 21, 40 L.Ed. 628, 94 L.Ed. 2098 (1974).                  21

Blackmer V. United States, 284 U.S. 421, 437, 52 S.Ct. 252 (1932)                      8

Blakely V. Washington, 542 U.S. 19, 59 S.Ct. 442 (1939)                                9

Bowen V. Johnston, 306 U.S. 19, 59 S.Ct. 442 (1939)                                    9

Boyd V. French, 147 F. 3d 319 (4th Cir. 1998)                                          14

Caha V. United states, 197 U.S. 211, 215, 14 S.Ct. 513 (1984)                          8

Clyatt V. United States. 197 U.S. 209, 217, 220, 49 L.Ed. 726, 730, 731, 25 S.Ct. 429    5

Cole V. Arkansas, 333 U.S. 196, 92 L.Ed. 644, 68 S.Ct. 514                             5

Collins V. Yosemite Parks&Curry Co., 304 U.S. 518, 82 L.Ed. 1502, 58 S.Ct. 1009 (1938)    11

Costello V. United States, 350 U.S. 359, 362, 363, note 6, 100 L.Ed. 397, 401 76 S.Ct. 406    6

Curry V. States, Tex. Cr. 264, 12 N.W. 2d. 796 (1928)                                  11

Darden V. WainWright, 477 U.S. 168, 181 (1986)                                         18

Deck V. Missouri, 125 S.Ct. 2007, 161 L.ed. 2d. 953 (2005)                             20

DeJonge V. Oregon, 299 U.S. 353, 81, L.Ed. 278, 57 S.Ct. 255                           5

Discovery House V. Counsel. City of Indianaoplis, 319 F. 3d. 277 (7th Cir. 2003)       15

Donelly V. DeChristoforo, 416 U.S. 637, 643 (1974)                                     18

Foley Bros V. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575 (1949)                          8

Gomillion V. Lightfoot, 364 U.S. 339, 5 L.Ed. 2d 110, 81 S.Ct. 125 (1960)              20

Hain V. Gibson, 287 F. 3d 1224 (10th Cir. 2002)                                        15

Hall V. United States, 404 F. 2d 1367 (10th Cir. 1969)                                 9

Hayes V. United States, 367 F. 2d 216 (10th Cir. 1962)                                 9

Hayes V. Woodward, 310 F. 3d 1054 (9th Cir 2002)                                14

Kuershner V. State, 493 P. 2d 597 (Okl. Cr. App. 1972)                         10

Lane V. Wilson, 307 U.S. 386, 95 L.Ed. 2d 110, 59 S.Ct 872 (1951)             20

Mason V. Mitchell, 320 F. 3d 604, 635 (6th Cir. 2003)                          18

Mesareosh V. United States, 352 U.S. 1, 1 L.Ed. 2d 1, 77 S.Ct. 2072 (1969)    13

North Carolina V. Pearce, 395 U.S. 711, 23 L.Ed. 2d 656, 89 S.Ct. 2072 (1969)  18, 21

Or. V. Kennedy, 456 U.S. 667, 676 (1982)                                       18

Paul V. United States, 371 U.S. 245, 9 L.ed. 2d 292, 83 S.Ct. 426 (1963)       12

People V. Williams, 136 Misc . 2d 294, 518 N.Y.S. 2d 751 (1987               10

People of the Territory of Guam V. Torre, 68 F. 3d 1177 (9th Cir. 1995)        13

Pfeiffer V. William Wriglet Jr. Co., 755 F. 2d 544, 557 (7th Cir. 1985)

Simpson V. James, 238 F. 3d 299, 409 (6th Cir. 2000)                           18

Stirone V. United States, 361 U.S. 212, 217-219 (1960)                         1, 7

State V. Agular, 85 Or.App. 410, 736 P. 2d 620 (1987)                          10

States V. Burger, 33 Ohio App. 3d 231, 515 N.E. 2d 640 (1986)                  10

States V. Chin Ping, 91 Or. 593, 176 P. 188 (1918)                             10

Torren V. Lockhead Martin Servs. Group Inc., 396 F. 3d 468, 10 BNA. WH CAS. 2d 491
(2005, Ca Puerto Rico)                                                         12

Towry V. States, 540 P. 2d 597 (Okl. CR. App 1975)                            10

United States V. Agurs, 427 U.S. 97, 49 L.Ed. 2d 342, 96 S.Ct. 2392 (1976)    14

United States V. Beckman, 222 F. 3d 512 (8th Cir. 2000)                        13, 15

United States V. Benson, 495 F. 2d 475, 481 95th Cir. 1974)                    9

United States V. Berry, 92 F. 3d 597, 600 ( 7th Cir. 1996)                     18

United States V. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed. 2d 621 (2005)  4, 21, 24

United States V. Bowman, 260 U.S. 94, 97, 98, 43 S.Ct. 39 (1922)              8

United States V. Carter, 430 F. 2d 1278 (10th Cir. 1970)                       9

United States V. Cassidy, 571 F. 2d 534 (10th Cir. 1978)                       9

United States V. Childress, 58. F. 3d 693 (D.C. Cir 1995)                      15

United States V. Cornett, 232 F. 3d 570 (7th Cir. 2000)                        15

United States V. Cotroni, 527 F. 2d 708, 711 (2nd Cir. 1975)                   8

United States V. Dhinsa, 243 F. 3d 635, 669 (2nd Cir. 2002    4

Uinted States V. Elam, 269 F. 2d 877 (7th Cir. 2001)    15

United States V. Fawley, 137 f. 3d 458 97th Cir. 1998)    13

United States V. Figueroa-Encarnacion, 343 F. 3d 23 91st Cir. 2003)    14

United States V. Goings, 800 (8th Cir. 1974)    9

United States V. Grant, 318 F. Supp 2d 1042 (2004 U.S. Dist Lexls 15562)    13

United States V. Heard,, 270 F. Supp. 198 ( W.D. Mo 1967)    9

United States  V. Hubbell, 530 U.S. 27, 147 L.Ed. 2d 24, 120 S.Ct 2037 (2000)    18

United States  V. Iglesias, 915 F.2d 1524 (11th Cir. 1990)    14

United States  V. Johnson, 426 F.2d 1112 (7th Cir. 1970)    9

United States  V. King, 522 F.2d 833, 851 (9th Cir. 1976)    8

United States  V. Mabrook, 301 F3d 503, (7th Cir. 2002)    18

United States  V. Machuca-Barrera, 261 F.3d 425 (5th Cir. 2001)    15

United States  V. Mc Elyea, 158 F.3d 1016 (9th Cir. 1999)    23

United States  V. Nichols, 937 F.2d 1257 (7th Cir. 1991)    21

United States  V. Norris, 281 U.S. 619, 622, 74 L.Ed. 1076, 1077, 50 S.Ct. 424    5

United States  V. O'Hara, 301 F.3d 653 (7th Cir. 2002)    19

United States  V. Ollivierre, 378 F.3d 412, (   th Cir 2004)    14

United States  V. Pate, 393 F.3d 412 (7th CIR. 1968)    10

United States  V. Pitt DesMoines Inc, 168 F.3D 976, 985, 986 (7th Cir. 1999)    4

United States  V. Pigee, 197 F.3d 879, 887 (7th Cir. 1999)    4

United States  V. Prince, 214 F.3d 740, 757 (6th Cir. 2000)    4

United States  V. Randall, 171 F. 3D 195, 203 (4TH cir. 1999)    4

United States  V. Redstone, 488 F2d 300 (8th Cir. 1973)    9

United States  V. Roarlo-Diaz, 202 F.3d 54, 70-71 (1st Cir. 2000)    4

United States  V. Spolar, 338 U.S. 217, 222, 70 S.Ct. 10 (1949)    8

United States  V. State Tax Com, 412 U.S. 363,37 L.Ed. 2d 1, 93 S.Ct. 2183 (1973)    12

United States  V. Syme, 276 F.3d 131, 151 (3rd Cir. 2002)    9

United States V. Townsend, 474 F.2d 209 (5th Cir, 1973) 41F. Supp. 13 (1941, Wash, D.C.)   12

United States V. Whites, 222 F.3d 363 (7th CIR. 2000)   15

United States V. Young, 470 U.S. 1, 11-12 (1985)   18

WhiteHead V. Cowan, 263 F.3d 708 (7th Cir. 2001)   15

Opinions Below

The seventh Circuit District Court, After a trial by jury, found Mr. Variances to be guilty of one part of his one count indictment of possession of as firearm by as convicted felon on February 25, 2005, case number 04-Cr-466 (Apprendix "A"). The Seventh Circuit Court of Appeals denied his Direct Appeal on August 17,2006, (Appendix "C"). The Supreme Court denied the Writ of Certiorari Case No 06-8344 on January 16,2007, (Appendix "D") and denied the Writ of Certiorari rehearing April 30,2007, (Appendix "E").

Jurisdiction

The denial of rehearing of the writ of Certiorari was on April 30,2007. The original Supreme Court decision was entered January 16,2007, as a denial. Under 28 U.S.C. section  2255 motion to vacate, set aside

and correct his conviction and sentence, he has a one year time limit from the time of the Supreme Courts final decision.

1) Was Mr. Vansach's Constitutional Rights violated when the court allowed the government to Constructively amend the charge one count indictment by removing the Armed Career Criminal Act before presenting it to the jury?

A) Standard of Review

The standard of review is based on a violation of both the Fifth and Sixth Amendment Rights to due process and a fair trial set forth in the United States Constitution. In which a defendant, has a right to a trial, based on the complete value of the indictment returned by the Grand Jury: (See; Federal Rules of Court Procedures 6 and U.S. Con st Amendments 5 and 6), when the indictment is changed by the court, without bringing it back in front of the Grand Jury, it violates both Fifth and Sixth Amendment Rights in the United States Constitution. When an indictment is changed without the Grand Jury's authorization, a Constutional violation accures and the charged indictment should be dismissed, along with the immediate release of the petitioner in question (See; Stirone V. United States, 361 U.S. 212,217-219 (1960) and Bain

1

V. United States 121 U.S. 1,30 LED 849, 2S.Ct. 781 (1887)).

B) Mr. Vansach is entitled to dismissal of the charge indictment and he is entitled to an immediate release from prison.

On May 13,2004, The Grand Jury returned on count indictment against Mr. Vansach for being a felon in possession of a firearm and the Armed Career Criminal Act (Appendix "F"). This indictment was fixed and basically corrected by the change of two of three words on December 15,2004. But right before trial, the court allowed the government to redact the back half of the one count indictment, by removing the Armed Career Criminal Act before presenting it to the trial jury. When this occurred, a violation under the Grand Jury clause tool place, which is in bedded into the U.S. Const. Fifth Amendment to due process. In Bain V. United States, 121 U.S. 1,30 LED. 849, 7 S.Ct.782 (1887), it has set the rule of the United States courts, that after an indictment has been returned, it's charge cannot be broadened or changed through amendment except by the Grand Jury itself, because it would violate the defendants right to a fair trial by a jury. In the case of "Bain", the court ordered that some specific and relevant allegations the Grand Jury had charged in the            indictment, be removed from the indictment upon the governments request, so that "Bain" might be            convicted and sentenced of those charges without proof of those particular allegations being presented

to the trial jury. In holding, that this cannot be done. Supreme Court Justice Miller speaking for the court said (121 U.S. 1,10);

"If it lies within, the Province of a court to change the charging part of the indictment, to have been, or what the Grand Jury would probably have made it if their attention had been called, to suggested changes, the great importance which the common law attaches to an indictment by a Grand Jury, as prerequisite to prisoner's on trial for a crime, and without which, the constitution says: ("No person shall be held to answer or fritter away, until it's value is almost destroyed")".

I        In Mr. Vasachs case, when the court allowed the government to remove the Armed Career Criminal Act from the indictment before presenting the charge to the trial jury. The court and prosecution covered up the fact that they were still going to sentence Mr. Vansach to the Armed Career Criminal Act by the courts findings, without the jury, in which they did. Which in fact violates Mr.Vansach's right to a fair trial. A variance between the indictment and proof, cannot be dismissed as a harmless error, specially

2

where the variance destroys the defendant's right to be tried on the charged indictment, the facts were removed from the indictment, that was returned by the Grand Jury. Which would result in an amendment and variance from the originally charged indictment authorized by the Grand Jury, and would violate the due process clause of the Fifth Amendment in the U.S. Const. Not only was the charged Indictment Amended from it's original form right      before trial, Mr. Vansach was then prejudiced by being sentenced for the part the court took out. The prosecutor let's you know that during his closing arguments too (Page 294 L. 4-11); Christopher Hotaling:

> "Now as the judge just mentioned and Mr. Acosta mentioned during his opening statement, the defendant      has been charged with the crime of being a felon in possession of a Handgun, and that particular crime, before you can find the defendant guilty of that Crime, the government has to establish three things beyond     a reasonably doubt, and I've prepared a chart that outlines what those three elements are so it's very clear"

Mr. Vansach was only  found guilty by a jury for possession of a firearm by a convicted felon, which by statue carries penalties of no more than 10 years in prison and 3 years supervised release, based on the jury's finding of guilt. But the sentencing court made it's own fact finding basis for adding the Armed Career Criminal Act for the sentencing purposes, after it was redact out for trial from the  original form of the indictment issued by the Grand Jury. Mr. Vansach was sentenced prejudicially to 210 months (17 1\2 years) in prison and 5 years supervised release off this constructively Amended indictment. In Blakely V. Washington, 542 U.S. 296,124 S.Ct. 2531,159 LED-2d 403 (2004), as an extension  of Apprendi V. New Jersey, 530 U.S.466,120S.Ct. 2348, 147 LED 2d 435 (2000), held; "That when a judge inflicts punishment that the jury verdict alone does not allow, the jury has not found all the facts which the law makes essential punishment, and the judge exceeds his proper authority". The Supreme Court held that "Blakely" applies to the federal sentencing guidelines in United States V. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 LED. 2d 621 (2005). Specifically, the Supreme Court issued a two part decision. In the  first part, the supreme court held that the mandatory sentencing guidelines violates a defendants Sixth Amendment Right to a jury trial, because a judge, not a jury, determined the facts which could increase the defendants sentence beyond which could have been imposed based on the jury's fact finding. The second part makes sentencing guidelines advisory. Mr. Vansach, Like "Blakely", are both

3

"Booker"claims to prejudicial sentences.

Not only did the Amendment of the indictment effect the jury and it's decision making process, it also effect Mr. Vansach's sentence pertaining to the jury's finding of guilt, by allowing the judge to make fact finding fact finding of guilt to increase the sentence beyond that allowed by statue. In United States V. Rosario-Diaz, 202 F.3d 54, 70-71 (1st Cir. 2000), IT is stated; " Constructive amendment of an indictment is a violation of the Grand Jury clause, if the court permits the jury to convict a defendant on evidence not included in the indictment." The complete trial transcript speak for themselves in Mr. Vansach's trial. The prosecution was allowed to use other alleged acts and alleged conduct as evidence to the jury, which went outside the charged indictment of possession of a firearm by a felon and Career Criminal Act, that allegedly happened on July 21,2003. Including the facts the prosecution could not at          anytime, prove any facts to support the accusations he was allow to give to the jury and again with          instructions that basically added constructive of a possession charge theory to secondly amend the charge indictment, after the defense rested. In United States V. Dhinsa, 243 F. 3d 635, 669 (2nd Cir.2002), It is stated: "Constructive Amendment of an indictment through jury instructions does violate the right to          a fair trial and violates the due process right as well." In United States V. Syme, 276 F.3d 131,151 (3rd Cir- 2002) and United States V. Randall, 171 F.3d 195,203 (4th Cir. 1999), it is stated ; "No indictment  or charge handed down by  the Grand Jury should be altered in any manner, without going back to the Grand Jury."

In Mr. Vansach's case, where the Constructive Amendment of the Indictment was very prejudicial, it would warrant an automotive reversal in his conviction, because the Constructive Amendment in his case is very prejudicial and a reversible error that can be dismissed because it violates the Grand Jury clause (United StatesV. Prince, 214 F.3d 740,757 "6thCir. 2000") and (United States V. Stuckey, 220 F. 3d 976, 981 "8th Cir. 2000). Even in United States V.. Pitt Des Moines Inc.,168 F3d 976,985-986 (7thCir- 1999), It is stated; "Amendment of the indictment charging a defendant is reversible error for unfair prejudice". In Mr. Vansach's case he was severally prejudiced by multiple due process violations and fair trial violations, to be added along with the Constructive Amendment          of the indictment was changed, it was a reversible error that mislead the jury and prejudiced Mr. Vansach (United States V. Pigee, 197 F.3d 879,887 "7th Cir. 1999). The court went on to hold in "Bain", "That after the indictment was changed,

it was no longer the indictment of the Grand Jury who presented it. Any other doctrine would place the rights of the citizen, witch were intended to be protected by constitutional provisions, at the mercy of control of the court or prosecuting attorney" (121 U.S. 1,13). Which is what happened in Mr. Vansach's case. The prosecutor was allowed to remove part of the one count indictment presented to the trial and jurors and this action violated Mr. Vansach's right to due process and a fair trial. Mr. Vansach was indeed prejudiced and the wrong needs to be corrected by dismissal of the indictment and also his immediate release.

The "Bain" case, which has never been disapproved, stands for the rule that the court cannot permit a defendant to be tried on charges that are not made out against him (See; United States V. Norris , 281 U.S. 619,622, 74 LED. 1076,1077,50 S.Ct. 424 and

"Cf" Clyatt V. United States, 197 U.S. 207,219,220,49 LED 726,730,731,26 S.Ct. 429). TO have a Grand Jury make a charge on it's own judgment is substantial right which cannot be taken away with Court Amendment. Here in the "Bain" case, we cannot know whether the Grand Jury would have included took away any changed in the indictment and when assumptions are made, the indictment was interfered with. Yet, because of the courts, admission of evidence and under the change of charge, this might have been the basis upon which the trial jury found the petitioner guilty. If so, the petitioner, Mr. Vansach was than convicted on an indictment the Grand Jury never made against him. This is fatal error (ColeV. Arkansas,333 U.S. 196,92 LED 644,68 S.Ct. 514 and Dejonge V. Oregon, 299 U.S. 353, 81 LED 278, 57 S.Ct. 255). In the "Bain" case, "Bain" was indicted for making a false statement " With intent to deceive the comptroller of the currency and the agent appoint to examine the affairs of the said association". After sub staining demurrer of "Bain" to the indictment, the trial court went on to say " there upon the motion of the United States, by counsel, the court orders that the indictment be amende by striking out the words the comptroller of the currency and therein contained'. By this Amendment, it was intended to permit conviction of "Bain" without proof that he had deceived the comptroller as the Grand Jury had charged. Yet, the Grand Jury was adopted in this contrary, and it continued from considerations similar to those which give to it it's chief value in England, and is designed as a means of protecting the citizen upon unfounded accusations, whether it comes from the government, or be prompted by partisan passion or private enmity. No person shall be required, according to the fundamental law of the country, except in

cases entwined, to answer for any of the higher crimes unless this body of the Grand Jury, shall declare, upon lear deliberations under the solemnity of a oath, that there is good reason for his accusations at trial". ( Bain V. United States, 121 S. 1,11 30 LED 849,859,852, 7 S.Ct. 782 (1887) and Costello V. United States, 350 U.S. 359,362,363 note 6, 100 LED 397, 401 76 S.Ct. 406.    When an indictment is filed with the court, no changes can be made in the body of the instrument by order of the court by the prosecuting attorney, without re submission of the case to the Grand Jury, and the fact that the court may deem the charge immaterial, as striking out a surplus of words, makes no difference. The instrument, as thus changed, is no longer the indictment of the Grand Jury which presented it. Even though, Mr. Vansach was aware of the Armed Career Criminal Act right before, he stated on record on February 17,2005 (2-17-05 pg 32 L. 10-16):

> "I was figuring that if it don't pertain to a possession of a firearms charged in the indictment that it wouldn't be brought up in the trial. You know if it's possession of a firearms and Career Criminal Act, that's what I should be on trial on. Anything other that they're saying that I assumbly did, shouldn't be brought up in trial because I'm not charged with it in the indictment."

Even after Mr.Vansach requested 6 days before trial, that he should be tried on what's in the indictment. The only charge presented to the trial jury was possession of a firearms by a felon, which means words and a charge was removed from the indictment by the court, for the prosecuting attorney, without re submission of the case back to the Grand Jury, and the fact the court allowed the striking out of a few words and a charge from the indictment, makes no difference how, the instrument, as thus changed, is no longer the indictment of the Grand Jury which presented it. This was the doctrine of the England courts under common law. It is uniform ruling of the America Courts, except where statutes prescribe a different rule: and it is imperative requirements of the provision of the constitution above recited, which would be a little avail, if an indictment once found, can be changed by the prosecuting officer, with consent of the court, and to comfort their views of the necessity of the case. Upon an indictment so changed the court can proceed no further. There is nothing in the language of the constitution, which the prisoner, can be held to answer, a trial on such an indictment is "void". There is nothing to try. According to the principles long settled in the courts, the prisoner, who stands sentenced to the penitentiary on such a trial, is entitled to his discharge by Writ of Habeas Corpus ("Bain"). Because the Fifth Amendment guarantee a defendant the right to be tried for only those offenses presented in an indictment returned by the Grand

Jury, an indictment, whether taking away of adding to, is not allowed and may not be substantively Amended. In Stirone V. United States, 361 U.S. 212,217-219 (1960). It is stated: "Amendment of an indictment violates the fifth Amendment Grand Jury Clause". After an indictment has been returned, it's charges cannot be altered, changed or broadened through amendment, except by a Grand Jury itself. Also, a federal court cannot permit a defendant to be tried on charges in the indictment, using other evidence of criminal activity as evidence, that are not charged in the indictment. In Mr. Vansach's case, he represented himself pro-se in shackles and was not allowed to cross examine the governments confidential informant. He objected to the voices on the audio cassette's and he objected to other alleged criminal activity and other alleged evidence. The court overruled every objection Mr. Vansach requested, and the court allowed the prosecution to use a prejudicial bully pit of an assault on Mr. Vansach's Character during his complete closing arguments (Exhibit "H"). While Mr. Hotaling's added false story's about traveling out of state to sell guns to gang members and he added prejudicial remarks calling Mr.Vansach "one man gun shop" and how scary it was to think about it. But If you look at the pretrial transcripts on February 17, 2005(2-17-2005,pg 30 L. 12-17) Prosecutor Acosta stated the following:

"Our evidence at trial, judge is that when Mr. Vansach is talking about traveling down and getting all these guns on July 14, that he, infact, did "not"do that. The evidence that we're going to present, is that he did not travel out of the state. There was surveillance done on him and there's no evidence that he traveled".

When combining all the facts to the jury trial of Mr. Vansach was highly prejudiced when they removed part of the one count indictment and in light of the entire trial and the Amendment of the indictment from it's original form. Mr. Vansach is entitled to a reversal of conviction, dismissal of the charge indictment and immediate release from United States Penitentiary Hazel ton.

2) Was Mr. Vansach's Constitutional Rights violated when Federal Authorities went outside their jurisdiction without ceding jurisdiction from the state of Illinois first?

A) Standard of Review

The Standard of Review is an abuse of jurisdiction by federal authorities when they arrested, held in custody, tried, convicted, and sentenced Mr. Vansach without ceding the proper authority from the state and in the federal authorities do not own the land where the alleged crime took place. (Adams V. United States, 87 LED. 1421, 319 U.S. 312 "May24,1943). The facts will show the state of Illinois never ceding the jurisdiction even took place.

7

B) Mr. Vansach is entitled to dismissal of all charges and should be granted immediate release.

It is well established principle of the law that all federal legislation applies only within the territorial jurisdiction of the United States, unless a contrary event appears: (See=Caha V. United States,  152 U.S. 211,215,14 S.Ct. 513 (1894) and American Banana company V. United States Fruit Company , 213 U.S. 347,357,29 S.Ct. 511 (1909) and the United States V. Bowman,260 U.S. 94,97,98,43 S.Ct.39 (1922) and Blackner V. United States, 284 U.S. 421,437,52 S.Ct. 252 (1932) and Foley Bros V. Filardo, 336 U.S. 281,285,69 S.Ct. 575 (1949) and United States V. Spolar,338 U.S. 217,222,70 S.Ct. 10 (1949)), and these principles of law is expressed in a number of cases from the federal Appellate Courts (See: United States V. Cotroni, 527 F. 2d 708,711 "2nd Cir. 1975") "holding discrimination laws as territorial", and it was best stated in "Caha V. U.S." Where the Supreme Court stated the following:

> The laws of congress in respects to those matters do not extend into territorial limits of the state, but have force only in the District of Columbia, and other places that are within exclusive jurisdiction the national government".

But because of the statutory language, certain federal laws operate extra-territorial: (See;United States V. King, 552 F. 2d 833, 851 (9th Cir. 1976)). The United States has jurisdiction only in Washington DC. has no jurisdiction over non-federally owed areas inside the territorial jurisdiction of the states within the American Union, and this Proposition of law is supported by hundreds of cases. The federal Authorities, working for the United States, had no actual jurisdiction over the State of Illinois pertaining to Mr. Vansach of the residence owned by his farther at 4149 W.     Cermak, Chicago inside the state limits of Illinois. So when Federal Agent Bray, wired up a CI Lauren Schmidt, to allegedly record conversations with the residence inside the property owned by George Vansach. The federal authorities exceeded their jurisdiction without adequate justification to violate the laws, set forth in the federal criminal jurisdiction to arrest, detain, convict or sentence Mr. Vansach for a alleged crime, that only  happened inside the state of Illinois. As a general rule, the power of the United States to criminally prosecute is for the most part confined to offenses committed "within" it's jurisdiction. This is born out of simply by examination of title 18 U.S.C. section 5, there of defines the term "United States" in clear jurisdiction terms. Section 7, contains the fullest statutory definition of the jurisdiction of the United States. The United States District Courts

8

have only jurisdiction over offenses Occurring within the "United States", pursuant to title 18 U.S.C.

section 3231. In Bowen V. Johnston, 306 U.S. 19,59 S.Ct. 442 (1939). The court ruled by concluding that

such a jurisdictional challenge could be raised in a Habeas Corpus petition, and if the United States is not

found to both own the property in question and had no states legislative grant ceding jurisdiction to the

United States, thus there is no jurisdiction in the United States to prosecute, in this case, Mr. Joseph

Vansach the petitioner. Because the United States did not own the property in question and because the

United States never cession jurisdiction from the State of Illinois, pertaining to MR. Vansach of the

property 4149 W. Cermak, the United States had no authority to arrest, try, convict or sentence Mr. Joseph

Vansach to alleged criminal activity outside their jurisdiction of the United States Federal Criminal

prosecution procedures. If the jurisdiction is not vested to the United States, persuant to the statute, there

is no jurisdiction (Adams V. United States, 319 U.S.312,63 S.Ct. 1122 ( 1943)). Without proof of

prerequisite ownership or possession of the United States V. Townsend, 474 F. 2d 209 ( 5th Cir. 1973), a

conviction for receiving stolen property was reversed when the court reviewed the record and learned

that the defendant had committed this offense within the jurisdiction of the United States. In another case

shortly after that United States V. Benson, 495 F 2d 475, 481 "5th Cir. 1974"), in finding federal jurisdiction

for a conviction committed at Forth Rucker, the Court stated: "It is axiomatic that the prosecution must

always prove territorial jurisdiction over a crime in order to sustain a conviction therefore". In United States

V. Johnson, 426 F. 2d 1112 ( 7th Cir. 1970) a case involving a federal burglary prosecution federal

jurisdiction was sustained upon the showing of the United States ownership and cession, and cases from

the 8th and 10th circuit likewise require the same elements to be shown to demonstrate the presence of

federal jurisdiction (See:United States V. Heard, 270 F. Supp . 198"WD Mo. 1967" United States V.

redstone,488 F 2d 300 "8th Cir 1973", United States V. Goings, 504 F 2d 809 "8th" Cir. 1974",

Demonstrating loss of the jurisdiction. Hayes V. United States, 367 F 2d 216 "10th Cir 1966", United

States V. Carter, 430 F 2d 1278 "10th Cir 1970", Hall V. United States , 404 F 2d 1367 "10th Cir. 1969",

and United States V. Cassidy, 571 F 2d 534 "10th Cir. 1978"). In this present case against Mr. Vansach,

the United States did not own possession of ownership over the alledged property. Nor did the United

States receive cession of jurisdiction from the state of Illinois. So the federal authorities were out of their

jurisdiction, by law, to arrest, confine, try, prosecute, convict or sentence Mr. Vansach without ceding

jurisdiction the State of Illinois pre requisitely. Il the above cases from the United States set forth the laws and foundation to the rule that in a criminal prosecution, the government, as a party seeking to establish the existence of federal jurisdiction, must prove United States ownership of the property in question and a state of cession of jurisdiction. The same rule manifest itself in state cases. State courts are courts of the general jurisdiction and in a state criminal prosecution, the State must prove that the offense was committed within the state and the county thereof. If a defendant contends that only the federal government has jurisdiction over the offense he, as proponent for the existence of federal jurisdiction, must prove the United States had ownership of the property where the crime was committed and State cession of jurisdiction. In Mr. Vansach's case proof of jurisdiction can be reached by his father's ownership of the building in question and what prosecutor Sergio Acosta told the court in his pre-trial report ( 2-17-05 pg 30 L 12-17):

"Our evidence at trial, judge, is going to be that when Mr. Vansach is talking about traveling down and getting all these guns July 14, that he in fact, did not do that. The evidence that were going to present is that he did not travel out of state. There was surveillance done on him, and there's no evidence that he traveled".

And If Mr. Vansach did not travel, combined with his father's ownership of the property in question, the building at 4149 W Cermak in Chicago, in the State of Illinois, was outside the federal criminal jurisdiction because the United States had no ownership and the complete record will reflect the United States never ceding jurisdiction from the state of Illinois. Without proving prerequisite cession of jurisdiction and without ownership and the complete record will reflect the United States never ceding jurisdiction of the state belongs to the state (See: People V. Williams, 136 Misc2d 294,518 N.Y.S. 2d 751 "1987 " and state V. Burger, 33 Ohio App. 3d 231, 515 N.E. 2d 640 "1986"),These show the proper method of federal jurisdiction in a state court and in a case involving a D.U.I. committed on the road near a federal arsenal. In Kuershner V. State, 493 p 2d 1402 (Oki. Cr . App. 1972), the state was held to have jurisdiction of a drug scale offense occurring at an Air Force Base, the defendant not having attempted to prove federal jurisdiction by showing title and jurisdiction of the property in question in the United States: ( See also: Towry V. State, 540 p 2d 597 (Oki. Cr. App "1975").  Similar holdings for murders committed at a United States post office were made in state V. Chin Ping, 91 Or 593, 176p. 188 (1918) and the United States V. Pate, 393 F.2d 44 (7th Cir. 1968). Another Oregon case State V. Aguilar, 85 Or App 410,736

P.2d 620 (1987), demonstrates this rule, and finally in curry V. State, 111 Tex. Cr. 264, 12 N.W. 2d. 796 (1928), it was held that, in the absence of proof that the state had ceded jurisdiction of a place to the United States, the state courts only have jurisdiction over an offense. In fact , the United States, nor it's federal authorities have any proof of any type of ownership documented pertaining to the property at 4149 W. Cermak, and the United States never received or ceded jurisdiction from the state of Illinois documented on record, and pertaining to Mr. Vansach and the property in question. The federal authorities violated the federal criminal jurisdiction agreement long settle with all the individual States, when they surveillance, arrested held in federal custody, tried and convicted, and than sentenced Mr. Vansach to an alleged crime only in the State of Illinois. Laws were held broken and need to be corrected. Mr. Vansach did not break these laws in in this case, the federal authorities did. Only the State of Illinois had the jurisdiction to charge, hold, try, prosecute and convict or sentence Mr. Vansach to this alleged possession of a firearm charge. Based on federal jurisdiction, there are three parts of section 3112. (a) Exclusive jurisdiction not required: (b) Acquisition and acceptance of jurisdiction: and (c) presumption. Leaning in the right direction of parts (b) & (c), it reads the following; (b) When the head of a department, agency or independent establishment of the government, considers it desirable, that individual may accept or secure, from the state in which the land or interest in the land that is under immediate jurisdiction, custody or control, or control of the individual situated consent to, or cession of, any jurisdiction on the behalf of the government. By filing a notice of acceptance with the governor of the state or in another manner prescribed by the laws of the state where the land is situated. (c) " It is conclusively presumed that jurisdiction had not been accepted, until the government accepts jurisdiction over the land as provided in this section." In the basic form of case annotations, Part 3 Acceptance of jurisdiction and Part 4 Procedure. The jurisdiction obtained by the United States from a state by consent or cession, may be qualified by agreement through offer and acceptance of ratification. Collins V. Yosemite Park & Curry Co., 304 U.S. 518,82 LED 1502,58 S.Ct. 1009 (1938). Which in view of former 40 U.S.C.S. section 255, no jurisdiction existed in the United States to enforce federal criminal laws unless, and until, consent to accept jurisdiction over lands aquired by the United States had been filed on the behalf of the United States as provided in said section, and the fact that the state had authorized the government to take jurisdiction was immaterial. Adams V. United States, 319 U.S. 312,87 LED 1421,63 S.Ct. 1122 (1943).

Since 1940, congress has required the United States to assent to transfer of jurisdiction over property, however it may be aquired. Paul V. United States, 371 U.S. 245, 9 LED 2d 292,83 S.Ct. 426 (1963) overruled as stated in Minnesota by Alexander V. Beck, 660 F.2d 1240 " Envt. Rep Cas 2199, 11 EXR 21033 (1981, CA8, Minn.). Under former U.S.C.S. section 255, which provided that unless and until the United States accepts the jurisdiction over lands aquired in accordance there with: "it shall be conclusively presumed that no such jurisdiction has been accepted," The United States assent was necessary to it's exercise of exclusive jurisdiction over lands acquired by It. United States V. State Tax Com., 412 U.S. 363, 37 LED 2d 1, 93 S,Ct, 2183 (1973). In one such case, a district courts determination that the United States lacked exclusive authority over piers area was vacated and the matter was remanded because of the 1940's letter that was supplied by the United States, if authentic and if it was supplied by the United States, if authentic and if it was sent, showed acceptance of federal authority over the area in question; However, former employees were free on remand to dispute authenticity of the leter, to show that their local law wage claims. Torren V. Lockhead Martin Serves. Group Inc., 396 F 3d 468, 10 BNA WH Cas. 2d 491 (2005, CA1 , Puerto Rico). Mere fact that the United States needs a title to a property within boundaries of the state, which may be acquired irrespective of consent of the states, does not necessitate assumption by the United States of burdens indictment to exclusive jurisdiction. United States V. Thompson, 41 F. Supp 13 (1941, DC. Wash). There was no documentation of the United States ceding jurisdiction in the complete file, nor was there any proof of ownership of lands by the United States. Without the authorization of the State of Illinois ceding jurisdiction to the United States and the federal atrocities, took It upon themselves to claim authority over the state with no documentation to show the right of the jurisdiction being cession ed to them. Without the properly filed documents being filed prerequisite, it has to be presumed that no such jurisdictional change has been either given or accepted. And If the United States claims such a document does exist, the petitioner Joseph Vansach challenges both the authenticity and the time it was filed, because it was not part of the record  or by trial jury. Part 4 of section 3112 jurisdiction reads as followed: "fact that the state had enacted statue ceding jurisdiction to the United States, did not constitute acceptance of jurisdiction by the United States as envisioned by former 40 U.S.C.S. section 255": and lagnuage "or in such other matter as may be prescribed by the laws of the state", did not relate to decision of the United States, whether it should or not aquire jurisdiction, but

to mode by which acceptance was indicated once the appropriate officer had deemed it desirable to aquire jurisdiction." In a more recent case (United States V. Grant, 318 F. Supp. 2d. 1042 "(2004, U.S. Dist Lexis 15562)"), Kevin Grant's crime of arson was committed within seven feet of federal land, and because it was not committed on federal land and the state had no ceding of jurisdiction to the United States , the United States had no jurisdiction had no right to surveillance, arrest, hold, convict or sentence Kevin Grant for his alleged crime. So on May 4,2004. The District court of Montana ordered that Kevin Grant's motion to be vocated be granted and his indictment to be dismissed without prejudice. Because of the rules set out by congress and the laws and rules pertaining to the Federal Criminal procedures set forth in the Constitution, Mr. Vansach, his indictment dismissed, and he should be immediately released from Hazelton Prison without prejudice.

  3) Was Mr. Vansach's Constitutional rights violated when the prosecutor used misconduct and a prejudicial closing argument based on false Information being given to the trial jury?

A) Standard of Review

The Standard of Review is "Prejury" on the behalf of the prosecutor, when Mr. Hotaling willfully intended to provide false statements to the trial jury, rather than confuse them, make a mistake, or to have false memory ( United States V. Fawley, 137 F. 3d :7th Cir. 1998"), and then assume prejudicial facts not in evidence and insuated possession of personal knowledge of facts not offered in evidence ( People of the territory of Gaum V. Torre, 68 F. 3d 1177 "9th Cir. 1995"). Also the prosecutors misconduct during closing arguments are grounds for a reversal of conviction (United States V. Beckman, 222 F. 3d 512 "8th Cir. 200"). Under these violations of the 5th & 6th Amendment Rights to the constitution of the United States, a federal prisoner has a right to a reversal of his conviction and his immediate release from prison under Habeas Corpus motion.

  B) Mr. Vansach is entitled to a reversal of his conviction and a immediate release from prison In the Supreme Court, it is highly noted that truthfulness is testimony, and the United states Government will not permit the conviction of any person on tainted testimony (Mesarosh V. United States, 352 U.S.1, 1 LED 2d 1, 77 S.Ct. 1 (1956). BUt in this case of MR. Vansach, it was the prosecutor Mr. Hotaling giving false information to the jury during his closing arguments.

13

He stated the following ( pg 301 L. 8-22 Exhibit "H") : Mr. Hotaling: " Starting with July 14,2003, you heard, you had an opportunity to hear three experts from an in person meeting between the CI and the defendant on July 14,2003. And in that conversation, they're talking about the fact the defendant is intending to go down some place in order to buy a number of "Handguns"

Mr. Vansach: "I object."

The Court: " Okay. Overruled. You can proceed."

Mr. Hotaling: " And that CI was interested in purchasing one of those handguns. It's a pretty interesting thing, ladies and gentlemen. I mean the defendant is posing himself to essentially be one man-gun shop. This is a guy who can get you the guns--if you want a particular gun, this is the guy who can get you that particular gun. It's kind of scary when you think about it."

There are so many violations in this little part of Mr. Hotaling's closing arguments, that are highly prejudicial to Mr. Vansach to destroy his character and to add false information to help support facts not in evidence. But to prove this fact of false information being giving to the trial jury, again, we just have to compare the other prosecutors statements in then pre-trial (2-17-2005 pg 30 L. 12-17): "Our evidence at trial, judge, is going to be that when Mr.Vansach is talking about traveling down and getting all these guns on July 14, that he, in fact did not do that. The evidence that we're going to present is that he didn't travel out of state. There was surveillance done on him, and there's no evidence that he traveled".To the entire record of the closing argument by prosecutor Mr.Hotaling improperly injected false statements about evidence that did not exist in his closing arguments, based only on his opinion and personal beliefs, That cannot be done in the United States Courts. ( See;  United States V. Nickens, 955 F.2d 112 '1st Cir. 1992" and United States V. Inglesias, 915 F. 2d 1524 "11th" Cir. 1990" and Boyd V. French, 147 F. 2d 319 "4th Cir. 1998" and United States V. Ollivierre, 378 F. 2d 412 "4th Cir. 2004" and United States V. Figueroa- Encarnacion, 343 F 2d 23 "1st Cir. 2003). When the prosecution is or should be aware that It is presenting perjured information, a strict standard of materially will be aplied and the conviction will be set aside if there's any likelihood that the false information could have affected the judgment of the jury. Convictions obtained by the prosecutor knowing he's using false information must be set aside, because the closing arguments affected the outcome of the trial. A new trial is required if perjured testimony could in any likelihood, had affected the judgment of the jury ( United States V. Agurs, 427 U.S. 97, 49 LED 2d 342, 96 S.Ct. 2392 (1976) and Hayes V. Woodford, 301 F.3d 1054 "9th Cir. 2002"). Adding the fact that Mr. Hotalimg continuously vouched for a CI and what she said in his closing statements ("Exhibit "H"), even though this CI did not testify. Improper vouching in a federal prosecutors closing arguments occurs when a prosecutor expresses his personal opinion about truthfulness or statements of a witness or when he implies facts not before the jury lend a witnesses

14

credibility ( United States V. Elem, 269 F.3d 877 "7th Cir. 2001", and United States V. Cornett, 232 F. 3d 570

"7th Cir. 2000"), the government may not speak about a CI of witness that did not testify at trial, in front of

the jury. A prosecutors closing argument cannot roam beyond the evidence presented during truial ( United

States V. Machuca- Barrera, 261 F. 3d 425 "5th Cir. 2001"). The entire closing arguments of MR. Hotalimg

was prejudicial (Exhibit "H"). He tried and did  get a conviction based upon charges not made in the

indictment ( Hain V. Gibson, 287 F.3d 1224 "10th Cir. 2002), which would constitute a denial in due process

and denial for a fare trial. He calls Mr. Vansach a "one-man gun shop" and tells the jury "it's kinda scary when

you think about it." These are prosecutorial misconduct during closing arguments and it's grounds for

reversal of conviction and dismissal of the indictment ( United States V. Beckman, 222 F.3d 512 "8th Cir.

200"). The government has a special responsibility to ensure the integrity of the criminal judicial process, by

living up to the code of professional ethics and fair play at all times ( United States V. White, 22 3rd 363 "th

Cir. 200-") and if the entire closing argument (Exhibit"H") is review and compared to the evidence of the case

and the trial transcripts and pre-trial transcripts, there are enough facts to support both prosecutorial

misconduct and prejudicial false and misguiding information being given to the trial jury by prosecutor Mr.

Hotaling. Due to the fact that Mr. Hotaling used a bully-pit of a closing argument to inflame passions of

prejudice against Mr. Vansach, to the trial jury, and he argued facts not in evidence, his closing arguments

are prejudicial and violates the United States Constitutions 5th and 6th Amendment (See" United States V.

Childress, 58 F.3d 693 "D.C. Cir. 1995, Bell V. Evatt, 72 F.3d 421 "4th Cir. 1995", and Whitehead V. Cowan,

263 F. 3d 708 "7th Cir. 2001"). Cumulative error applies when, although no single trial error examined in

isolation is sufficiently prejudicial to warrant reversal, the cumulative of multiple errors may still prejudice the

defendant and a federal court may use any available remedy to make good of the wrong done ( Discovery

House V. Counsel. City of Indianapolis, 319 F. 3d 277 "7th Cir. 2003"). Reading Mr. Hotalings closing

argument going piece by piece shows actual prejudice. Mr. Hotaling opens-up by stating the defendant

possessed an gun (pg 292 L. 18-22). But when you get the facts from the three agent witnesses, it's totally

different: (Vol 2 pg. 224 L. 7-9)

Mr. Vansach: Okay, one more question for you Ma'am did you see me in possession of a firearm?
Agent Bray: No.(Vol2 pg. 240 L. 25 to pg 241 l. 7)
Mr. Vansach: Okay. Did you see me in possession of a firearm?Agent Uribe: No.(Vol 2 pg 256 L 12-16)
Mr Vansach: I want to ask you a question. Did you see me in possession of a firearm?
Agent Johnson: No, I didn't.

But Mr. Hotaling told the trial jury more than ten times at least that Mr. Vansach had possession of a gun with no facts, no witness and no proof or evidence to support his claim. Mr. Hotaling only pitched his personal beliefs on a story he created for the jury. Between pages 292 and 293, Mr. Hotaling became a voice anylist and tell the jury that it's my voice and then lies about the gun traveling in interstate commerce on July 21,2003. Than Mr. Hotaling goes on to give a definition to two different elements pertaining to the jury instructions, between pages 295 and 296, Mr. Hotaling explains the stipulation and three elements to be a felon in possession of a firearm and than he pushes off Agent Walsh as the government witness who gave his opinion about dispute because "the defendant didn't cross-examine Agent Walsh". Page 297 and 298, again Mr. Hotaling pushes off his personal opinion, to tell the jury about how Mr. Vansach possessed a firearm with nothing to support his claim, except for him vouching for agents and the witness who did not testify. Following up on his belief, he vouches for the case agent who claimed she heard my voice and at trail she stated: ( Vol 2 pg 214 L. 17-20) She "didn't actually meet me or speak to me before July 21,2003". But Mr. Hotaling's claim she recognized my voice on the tape and he vouched for agent Bray based on false information he was saying to the trial jury. From pg 298 L. 22 to pg. 299 L 4, Mr. Hotaling introduces transcripts he made and agent Bray tampered with, into evidence. The prosecutor falsified information to the jury about the surveillance agents, because not one of the agents testified in trial, the fact if they actually seen the CI enter the building, only agent Johnson seen her go down the east side gangway. Than Mr. Hotaling goes on to tall the jurors they could basically rely on the tapes and transcripts Mr. Vansach objected to and the court overruled. Even though it had false and misleading information that prejudiced the defendant and was not suppose to be evidence. Refering to page 299 L. 5-8, Mr. Hotaling tries to create a story using the agents and their positions to influence the jurors with false information on what the agent seen in relations to the building. the complete trial transcript speaks against his theory of a story. Agent Bray and Agent Uribe could not see the building because they were two blocks away inside a parking lot and agent Johnson never seen a person enter the building, he only seen the CI who did not testify, enter the east side gangway. As he continues ( pg 299 L. 9-23), Mr. Hotaling uses the transcript booklet he created and put names next to who he believes the speakers are, and introduced them to the trial jury as evidence of who the speakers were. From page 299 L.24 to 300 L.4, Mr. Hotaling continues to create a story and lies to the jury, about facts of evidence not presented to the court. Detective Johnson said (page 255 L. 1-2): "Through the same--through the gangway, so I'm assuming it was the back door'. But Mr. Hotaling told the jury "detective

Johnson seen the defendant and a woman come out of the building and get into a car". The trial transcripts speak for themselves, there's no evidence or facts stated that anybody seen the defendant come out of the building except prosecutor Mr. Hotaling. Page 300 L. 5 to page 301 L.7, Mr. Hotaling started again into this story of his personal beliefs to create a crime with no actual of factual evidence to support the things he was saying. As he continues this story, he tells the jury based on deceit and evidence that was not there. From pg 301 l. 3-22, you can read about prosecutorial misconduct, false information and prejudicial remarks that could not be cured at any point even if the court tried. Mr. Vansach was battered and abused by this prosecutor. Page 301 L. 23 to page 301 L. 21, Mr. Hotaling continues on with this prejudicial story he created in reference to the tapes and transcripts, which were being used as evidence without the CI who allegedly recorder the tapes, ever being cross-examined at least one time. Than Mr. Hotaling creates new words and fills in the blanks of what he believes is said, and at no pint related to the trial evidence on hand. Highly prejudicial and a violation to a fair trial by jury. From page 304 L. 10 to page 305 L. 7, Mr. Hotaling twist up his alleged story and information, to insert words and meanings to those words, and was allowed to do so over Mr. Vansach's objections. Page 305 L. 16 to page 306 L. 1, Mr. Hotaling explains to the trial jury they can consider the CI statements and conversation even though she did not testify and "You don't need to rely on the CI, you can't rely on the CI at all". Than he continues to vouch for the CI and states that it's the defendants voice on these tapes, and he tells the trial jury, "Listen to the voice, it establishes possession". The CI never testifies and Mr. Hotaling built his entire case around a CI that nobody could trust. He and agent Bray had problems with rules about this CI following them, they could not trust his CI Lauren Schmidt. The trial transcripts speak for themselves. The rest of pg 306 of Mr. Hotaling's closing argument, he continues on with his bully-pit of misleading false information to the trial jury, again telling the jury the CI entered the building when that's not a fact in evidence. No one , ever being questioned. Which in fact shows Mr. Hotaling vouched for a government witness that did not testify in court to the jury. From page 306 L. 25 to page L. 9, Mr Hotaling starts adding bits and pieces to his story to create a fairy-tail of what the jury should believe. Not based on truth, not based on facts and not based on evidence, only based on what he wants the jury to believe based on his story. No matter how many times Mr. Vansach objected, Mr. Hotaling was allowed to assault Mr. Vansach's character and create a story about him. Mr Hotaling was verbally shackling Mr. Vansach to the tracks so he could be railroaded. Page 309 L. 10-19, Mr. Hotaling explains the only factual possession of a firearm, when he tells the jury what he believes Mr. Vansach remembered

"Subsequent to It, he's admitting again this earlier possession in an effort to try and get another deal done". Than Mr. Hotaling finished his closing arguments by stating for the 20 time: "he had the gun in his hand, he possessed it, and he sold it for $450". With no proof and a Ci nobody could trust, he created a story to the jury. This was a prejudicial landslide of a closing argument that boot strapped a conviction to Mr. Vansach, and this wrong needs to be corrected. In United States V. Berry, 92 F.3d 597, 600 (7th Cir.1996), a new trial is required because of unauthenticated transcripts of telephone conversations used by the jury during deliberations cause prejudice. When Mr. Hotaling pushes unauthenticated tapes and transcripts to the jury to bring with them into the deliberation room to listen to and read, was highly prejudicial and violated Mr. Vansach's right to a fair trial and violated the due process clause of the 5th Amendment. In Mason V. Mitchell, 320 F. 3d 604, 635 (6th Cir. 2003), Simpson V. James, 238 F. 3d 399, 409 (6th Cir. 200) and United States V. Mabrook, 301 F.. 3d 503, 509 (7th Cir. 2002), These cases state: " The prosecutor's misconduct must be so pronounced and persistant that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant". A criminal conviction is not to be lightly overturned on basis of prosecutor's comments alone: Statements must be viewed in context of the entire proceedings in order to determine whether conduct affected fairness of the trial. Darden V. Wainwright, 477 U.S. 168, 181 (1986), Donelly V. DeChristoforo, 416 U.S. 637, 643 (9174), United States V. Young, 470 U.S. 1, 11-12 (1985) and Or V. Kennedy, 456 U.S. 667, 676 (1982). Prosecutorial misconduct may arise when the government calls witnesses in coscious and flagrant attempt to build it's case out of inferences arising from the use of testimonial privilege. The 5th Amendment protection encompasses compelled statements that lead to discovery of incriminating evidence even though the statements themselves are not incriminating and introduce into evidence. United States V. Hubbell, 530 U.S. 27, 147 LED 2d 24, 120 S.Ct. 2037 (2000) and North Carolina V. Pearce, 395 U.S. 711, 23 LED 2d 656, 89 S.Ct. 2072 (1969). There is an understanding a prosecutor can strike hard blows in an earnest and vigorous prosecution, but the prosecutor, in the case of Mr. Vansach, Mr. Hotaling only made foul ones to prejudice the defendant ( Berger V. United States, 295 U.S. 78, 88, 79 LED 1314, 55 S.Ct. 629 "1935"). A criminal prosecution which would not have been initiated but for vindictiveness is constitutionally prohibited. The remedy for prosecutorial vindictiveness is dismissal of the charges or other appropriate remedies.

A defendant seeking to prove prosecutorial vindictiveness for a decision, must present objective evidence showing genuine vindictiveness, United States V. o'Hara, 301 F. 3d 563 ( 7th Cir. 2002). this issue was raised in a pro-se brief on the merit during Mr.Vansach's direct appeal and was bushed off by the court, the prosecutor and the Appellate Attorney. With the closing argument given her in (Exhibit "H") and the information and facts of the trial transcripts along with the entire case load. It is a fact that Mr. Vansach was prejudiced by prosecutorial misconduct and prosecutorial vindictiveness during his trial. The prosecutor violated the due process laws set in the United States constitution and took away Mr. Vansach's right to have a fair trial by jury. Do to the facts of the pre-trial transcripts, trial transcripts, and closing arguments combined. Mr. Vansach's rights were violated and Mr. Vansach is entitled to dismissal of all charges and an immediate release from Hazelton United States Penitentiary.

4) Is the court allowed to take away several of your constitutional rights, because you requested to represent yourself at trial Pro-se?

Argument

Mr. Vansach was shackled and not allowed to question the only government witness because he requested to represent himself pro-se at trial. Mr. Vansach was only shackled in front of the jury during trial, while the jury was present. When the jury was inside the courtroom, Mr Vansach was paraded around in shackles, when the jury was not in the courtroom, Mr. Vansach was not in shackles. Which would in fact prove in itself, the court had Mr. Vansach shackled only to lean the jury in favor of the government. It was stated by the court that there was documents where the United States Marshals requested the court to shackle the defendant, but in the complete case file, no such document exist. There are two complaints that do exist, but neither rise to the request to shackle Mr. Vansach while he represents himself in a trial by jury. At the end of Mr. Vansach's trial, about three and a half months later, the court stated for the record the reason he had Mr. Vansach shackled during his trial by jury while he represented himself. ( Sentencing Tr. 6-01-05 L. 30-31):

"Well, Mr. Vansach, I've tried to convince you not to go down this pro-se route. I was unfortunately unsuccessful in that and I think the same thing has hampered this case all the way through, that is your lack of judgment, your prior criminal history. I say this not because I want to cause you any further aggravation than I need to, but I say that because your lack of judgment and not following my advice and having Mr. Ravitz represent you has caused all sorts of problems in this case, none the least of which has, when coupled with your prior criminal history, led to the courts decision to shackle you on the serious recommendation of the Marshal".

In fact, there was no written recommendation by the United States Marshals office. Mr. Vansach's

prior criminal history consisted of the two simple misdemeanor batteries, which were enhance to felonies because they involved police officers. These happened in 1994 and 1995. There also was an armed robbery which Mr. Vansach admitted to doing and claims that was his only felony crime he was convicted for that he actually served over one year in prison. Other than that, Mr. Vansach had no felony convictions in his criminal history. All other charges against him were dropped, dismissed, or beaten by not guilty and no probable cause. So the most recent indictment of conviction would of been May 18,1997, more than seven years prior to his arrest. This is not a proper foundation to shackle a defendant based on his prior criminal history. Which points directly to the reason why Mr. Vansach was shackled, because he wanted to represent himself in his own defense at trial by a jury. the supreme court knows the use of visible shackles is inherently prejudicial and results in the denial of the 5th, 6th, and 14th Amendment Rights to a fair trial and due-process. Consequently the trial courts actions must be adequately justified. Deck V. Missouri, 125 S.Ct. 2007, 161 L.ED. 2d 953 (2005). In fact, when added to the courts comments, it was no reason for Mr. Vansach's judgment or knowledge to ever get in the way of him representing himself. Because the court said: "I do want to commend you, Mr. Vansach, for the way you've comported yourself throughout this trial. I think you're representing yourself very well." (Vol 2 Tr. pg 287). The court was allowed to use simple minded modes of discrimination to find Mr. Vansach guilty. Shackling him only in the presence of the jury is one mode, and the other is not allowing him to cross-examine the government only key witness who allegedly purchased a firearm from Mr. Vansach. She also admitted to the government that she falsely accused Mr. Vansach of prior crimes twice before and she admitted she lied on him. Not to mention the facts, that the court stated during trial the evidence was weak, but there was enough for the jury to decide. The only evidence that was presented by the government, was misleading and false and when Mr. Vansach was shackled to undermind his defense to make him look guilty. In Lance V. Wilson, 307 U.S. 368, 95 L.Ed. 2d 110, 59 S.Ct. 872 (1951) and Gomillion V. Lightfoot, 364 U.S. 339, 5 L.Ed. 2d. 110, 81 S.Ct. 125 (1960), it is stated: "One must be aware aware, that the constitution forbids any 'sophisticated', as well as simple minded modes of discrimination". In Mr. Vansach's case, when he decided to represent himself, the court helped the government use every method to prejudice and convict Mr. Vansach outside the rules of justice and the American way. The court had no reasonable excuse to shackle Mr. Vansach or to not let him question his accuser. The acts , in fact, "Prosecutorial

Misconduct" on the part of the judge. North Carolina V. Pearce, 395 U.S. 711, 23 L.Ed. 2d. 656, 89 S,Ct. 2072 (1969). In reviewing case law related to shackling, during a trial by jury, that shackling is considered very much highly prejudicial. But in the "Deck case, the court noted that judicial antipathy towards shackling is based upon several fundamental legal principles:

1) Visible shackles undermines the presumption of innocence and the related fairness of the fact finding process.

2) Shackling can interfere with the defendant's ability to participate in his own defense.

3) The use of shackles at trial affronts the dignity and decorum of the judicial proceedings the judge is seeking to uphold.

Mr. Vansach was severely penalized for enacting his right to represent himself. The court punished him by taking away the 5th. and 14th amendments protecting him against prosecutorial of judicial actions intended as penalties for a defendant's exercise of his constitutional rights ( United States V. Nichols, 937 F. 2d. 1257 "7th Cir. 1991). In Blackledge V. Perry, 417 U.S. 21, 40 L.Ed. 2d 628, 94 S.Ct. 2098 (1974), it is the due process, for the government to penalize a person merely because he exercised his protected statutory or constitutional rights". Mr. Vansach requested his sixth Amendment firth to represent himself and because he stood strong on representing himself, the court took away his 5th and 14th Amendment rights by shackling him and took away his 6th Amendment Right to a fair trial by not letting him question his accuser and allowing the prosecutor to prejudice Mr. Vansach in any way to seal a conviction. It is a violation of the United States Constitution to take away several of a defendants rights because he wished to obtain one single right allowed by law. Mr. Vansach represented himself pro-se, he was severely prejudiced by the court and by the government. Mr. Vansach is entitled to a new trial that he is not prejudiced in.                    5) Was Mr. Vansach unconstitutionally sentenced over the statutory maximum sentence allowed by the jury's finding of guilt?

A) Standard of Review                                    The Standard of review is based on the judge giving an enhanced sentence based on his own fact finding that the jury did not find or allow, in violation of Mr. Vansach's right to a fair trial by jury ( United States V. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed. 621 (2005)). Once a defendant is unfairly sentenced by enhancement outside the

jury's finding of guilt. The defendant is entitled to be representence defined by statue for the jury's finding

of guilt.                                                                    B) Mr. Vansach is entitled to being re

sentenced to the statue of the jury's finding o guilt.

On May 10.2004, Mr Vansach was arrested and charged

with 18 U.S.C. section 9229(g)(1) and 18 U.S.C. section 924 (e), respectfully possession of firearm by a

felon and Armed Career Criminal Act. On May 13,2004 he grand jury returned a one count indictment that

charged Mr. Vansach with these two offenses (Exhibit "F'). On December 15,2004, The Grand Jury

returned the same one count indictment (Exhibit "G"), but removed the words "at the time he possessed

this firearm, had at least three previous convictions for violent felonies committed on occasions different

from one another." But Violations of Title 18 u.S.C. section 922 (g)(1) and 924 (e) remained in tact on the

charging instrument handed down by the Grand Jury. On February 17,2005, Mr. Vansach requested to

represent himself pro-se , and ask the court that he be tried on the charged indictment ( 2-17-05, pg. 32 l.

10-16): " I was figuring that if it don't pertain to a possession of a firearm charged in the indictment, that it

wouldn't be brought up in the trial. You know, if it's possession of a firearms and Career Criminal Act,

that's what I should be on trial on. Anything other than that they're saying I as sum ably did, shouldn't be

brought up in the trial because I'm not charged with it in the indictment." A few minutes later, the court

stated for the record the following (2-17-05, pg 33 l. 11-15): " I will give a limiting instruction under rule 404

(b) so that the jury can properly evaluate this evidence and understand that the only thing that Mr.

Vansach is in trial for is the charge in the superseding indictment. On February 23,2005, before trial

began, Mr. Vansach, Christopher Hotaling, Sergio Acosta and Gary Ravitz had agreed to one of three

stipulations stating "prior to July 21,2003, the defendant, Mr. Vansach, had been convicted of a crime

punishable by a term of imprisonment of more than one year", (Exhibit "I"). Because Mr. Vansach

challenged two of the three convictions as being enhanced misdemeanors. On February 25,2005, after a

three day trial. Where the court nor the government ever at one time mentioned the Armed Career

Criminal Act to the trial jury. The judge gave  his jury instructions to the jury, including jury instructions No.

9 (Exhibit "j'), which reads: "The defendant is charged with the offense of possessing a firearm after

having been previously convicted for a crime punishable by imprisonment for a term exceeding one year".

the jury deliberated for about an hour and came back with the verdict the defendant was guilty of being in

possession of a firearm by a felon. The jury was never presented with the other offense in the one count indictment, so no fact finding information could exist for the Armed Career Criminal Act pertaining to the trial jury. Mr. Vansach was only convicted of being a felon in possession of a firearm. Looking into United States V. McElyea, 158 F.3d 1016 (9th Cir. 1999), where it is stated: " A crime of a single transaction may not be counted separately under the Armed Career Criminal Act. But both offenses should be placed in front of the trial jury." The government separated the charged offenses and the court went along with the government. Mr. Vansach was found guilty by the jury of the lesser offense in the one count indictment, and was not found guilty of the Armed Career Criminal Act by the trial jury. Mr. Vansach requested to have both offenses heard by the jury (2-17-05, pg.32 L. 10-16), but the court allowed the government to only prosecute Mr. Vansach for possession of a firearm by a felon. That is Mr. Vansach's only conviction in this criminal case. Now Mr. Vansach challenged the sentencing court again about prior convictions during the sentencing court again about prior convictions during the May 3rd, 2005. Mr. Vansach objected to the P.S.I> report and objected to the application of the Armed Career Criminal Act. He challenged the fact that he should only be sentenced under jury's finding of guilt. Considering there is no sentencing structure under Title 18 U.S.C. section 922(g)(1), and the fact sentencing is placed on Title 18 U.S.C. section 924 (a) which reads: ' Whoever knowingly violated subjection (a)(6), (d), (g), (h), (i), (j) or (o), of sections 922 shall befined as provided in this title and imprisoned not more than ten years of both." also the maximum supervised release allowed is not more than three years. Mr Vansach was not sentenced fairly by the jury's finding of guilt. On May 3,2005, the court denied all the motions filed by the defense and decided the court is allowed to make the fact finding information to determine the application of the Armed Career Criminal Act , as an enhancement over the jury' finding of guilt. Even the court stated for the record, with the government in agreement, that it was a significant enhancement over the jury's finding of guilt (5-3-07 pg. 19 L. 8-10): The court: This results in a significant enhancement of the defendant's sentence. Mr. Hotaling: That--that's true, your honor. So the court continued the sentencing hearing to make it's own fact finding to increase the punishment of Mr. Vansach over the jury's finding of guilt, based on misdemeanor's that were already enhanced once by the State of Illinois because they were simple batteries involving Chicago Police officers, for two of the three convictions to apply the Armed Career Criminal Act. On June 1,2005, the court allowed some argument by Mr. Vansach, where the prior conviction documents indicted

that he was in handcuffs when these offense occurred in 1994 and 1995. One incident occur during processing period at the 17th District Police station and the other occurred when everybody fell down while placing Mr. Vansach in a police car. The worst injuries were scraped knees bloody knuckles on the police officers, which were stated in the police officers, which were stated in the police reports and documented in the State Court transcripts. One conviction came from an un counseled bond hearing which resulted in a 402 conference and 30 month probation and the other had a different spelling of Mr. Vnasach's name and a different social security number than Mr. Vansach in this trial. During the proceedings (6-1-05, pg 5 L. 7-21): Mr. Vansach argued about being in handcuffs for these offense and argued all these offense should of been introduced to the trial jury. Because he only stipulated to one prior felony conviction (Exhibit "I"), not three, the government pushed the court to give a significant enhancement, and Mr. Vansach stated "It don't reflect towards the jury ever seeing three convictions on hand." Mr. Vansach stated his position (6-1-05, pg. 6 L 2-4), that the sentence can't go over the statutory maximum of zero to ten years without being placed in front of the jury. But the court stated the seventh circuit laws rejects that position and the court mentions the case United States V. Booker, 543 U.S. 220, 125 S.Ct. 738, 160. L.ed. 2d 621 (2005). Which actually states the sentencing guidelines is a violation of a defendants sixth amendment right to a fair trial by a jury, because, a judge, not a jury, determine the facts to increase the defendant's sentence over that allowed by the jury's finding of guilt. In Blakely V. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed. 2d 403 (2004) and Apprendi V. NewJersey, 530 U.S. 466, 120 S.Ct. 2343, 147 L.Ed. 2d 435 (200), it is stated: "When a judge inflicts punishment that the jury verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment, and the judge exceeded his proper authority." In the trial and sentencing of Mr. Vansach, he was indeed, unconstitutionally sentenced. The record will reflect, on 2--08-05, 2-09-05, and 2-17-05, that Mr. Vansach did not want to stipulate to anything. His stand-by counsel Gary Ravitz's was coercing him into signing the stipulations and court was pressuring Mr. Vansach into stipulating with the government by trying to question his request for self representation. So under duress, Mr. Vansach only stipulated to one prior conviction, because the other two convictions were already enhanced from misdemeanor's to felonies because the involved Police officers. Now those same two enhanced misdemeanor's are being used to enhance Mr. Vansach a second time to the armed Career Criminal Act, that would be a double

enhancement and Double Jeopardy clause violation. Even the prosecutor agreed with Mr. Vansach that the stipulation was to one felony conviction (6-1-05, pg 8. L. 20-24):

> The court: Nevertheless, as part of the record in this case, there is a signed old chief stipulation.
> The Defendant: To one felony convicting.
> Mr. Hotaling: Correct.
> The Defendant: Not to three.

On page 14 L. 20-22 (6-1-050, the court makes it's own fact finding decisions by stating: "That's what I want to talk about. We don't even need the use of force. All you need is the threatened use of force." Which when calculated, would no longer be pertaining to a violent felony act. Than the court added "All you need is a serious potential risk of potential injury." Now the court took two minor simple batteries for resisting arrest and created potential violent felonies to apply the Are Career criminal Act. Which would secure an unconstitutional sentence based on a fair trial by jury. The court took it upon itself to determine the facts to apply the Armed Career Criminal Act as an enhanced sentence. The court sentenced Mr. Vansach to the low end of Criminal Category five at offense level 33 (210 to 262 months), which was 210 months and five years supervised release. When in fact, without the enhancement and the four extra points for the enhanced argued misdemeanor offenses. Mr. Vansach should have been sentenced at Criminal Category four and offense level 24 ( 77 to 96 months). 77 months in prison and no more than three years supervised release at the low end of the actual guideline range. Mr.Vansach was indeed unconstitutionally sentenced and he is entitled to be re sentenced to 77 months in prison and no more than three years supervised release.

## Conclusion

For the forgoing reasons, Mr. Vansach is entitled for a miscarried of justice and immediate release from prison for arguments one and two. For the forgoing reasons, Mr. Vansach is entitled to a new trial for the arguments in three and four. for the forgoing reasons, Mr. Vansach is entitled to a reduced sentence to 77 months in prison and no more than three years supervised release for the argument five.

Joseph Vansach 17041-424
U.S.P. Hazelton
P.O. Box 2000
Bruceton Mills W.V. 26525

## CERTIFICATE AND PROOF OF SERVICE

I, _Joseph Vansach_ , a moving party to the above outlined action, certify that I

caused to be served upon the party(ies) identified below a true, correct, and complete copy of

the original above oulined: _28 U.S.C. Section 2255 Habeas Corpus Motion_

postage-prepaid to:

Micheal Dubbin
Office of the Clerk
U.S. District Courthouse
219 S. Dearborn St
Chicago IL. 60604

Christopher Hotaling
U.S. Attorney
219 S. Dearborn st
Chicago IL. 60604

Gary Ravitc
Attorney At Law
203 N. LaSalle st Suit 2100
Chicago IL. 60601

on this: _08th_ day of: _January_ , 20 _08_ , in a sealed envelope, and

placing same with said enclosures in the internal mail system system located at:

/s/ _____

## TABLE OF APPRENDIX

1) Apprendix A: (6-1-05) 04-Cr-466 Judgement in criminal case

2) Apprencix B: (8-17-06) 05-2790 Court of Appeals decision

3) Apprendix C: (9-26-06) 052790 Court of Appeals "en Banc" hearing

4) Apprendix D: (1-16-07) 06-8344 Writ of certioari "Denied"

5) Apprendix E: (4-30-07) 06-8344 Writ Rehearing "Denied"

6) Apprendix F: (5-13-04) Original Indictment

7) Apprendix G: (12-15-04) Superseding Indictment

8) Apprendix H: (2-25-05) Complete Closing Argument by Mr.Hotaling

9) Apprendix I: (2-23-05) Agreed Signed Stipulation

10) Apprendix J: (2-25-05)　Jury Instruction No.9

1) Apprendix A:

(6-1-05) 04-Cr-466 Judgement in Criminal Case

AO 245B   (Rev. 12/03) Judgment in a Criminal Case
          Sheet 1

# UNITED STATES DISTRICT COURT

NORTHERN _____   District of _____ ILLINOIS

UNITED STATES OF AMERICA        **JUDGMENT IN A CRIMINAL CASE**
V.

Joseph Van Sach        Case Number:        04 CR 466-1

                       USM Number:         17041-424

                       Gary J. Ravitz
                       Defendant's Attorney

## THE DEFENDANT:

pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☑ was found guilty on count(s)   One of the Superseding Indictment
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| U.S.C. 922(g) and 924(e)(1) | Possession of a weapon by a felon | July, 2003 | One |

The defendant is sentenced as provided in pages 2 through ___6___ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☐ Count(s)   all remaining        ☐ is   ☑ are   dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

June 1, 2005
Date of Imposition of Judgment

Signature of Judge

Ruben Castillo - U.S. District Judge
Name and Title of Judge

June 3, 2005
Date

245B    (Rev. 12/03) Judgment in Criminal
        Sheet 2 — Imprisonment

Judgment — Page    2    of    6

DEFENDANT:        Joseph Van Sach
CASE NUMBER:      04 CR 466-1

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:

210 months on Count One of the Superseding Indictment

■ The court makes the following recommendations to the Bureau of Prisons:
That the defendant be placed at Rochester, MN.   It is also recommended that the defendant receive mental health counseling and treatment and participate in a drug treatment program.

■ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at _____ ☐ a.m. ☐ p.m.   on _____ .

☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☐ before 2 p.m. on _____ .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:




Defendant delivered on _____ to _____

a _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

245B    (Rev. 12/03) Judgment in a Criminal ε
Sheet 3 — Supervised Release

Judgment— Page  3  of  6

DEFENDANT:       Joseph Van Sach
CASE NUMBER:     04 CR 466-1

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of :

five (5) years.

The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state or local crime.

The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

☐    The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of
       future substance abuse. (Check, if applicable.)

■    The defendant shall not possess a firearm, destructive device, or any other dangerous weapon. (Check, if applicable.)

■    The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a
       student, as directed by the probation officer. (Check, if applicable.)

☐    The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

If this judgment imposes a fine or restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION

1)   the defendant shall not leave the judicial district without the permission of the court or probation officer;

2)   the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of
      each month;

3)   the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4)   the defendant shall support his or her dependents and meet other family responsibilities;

5)   the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other
      acceptable reasons;

6)   the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;

7)   the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any
      controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;

8)   the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9)   the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a
      felony, unless granted permission to do so by the probation officer;

10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any
      contraband observed in plain view of the probation officer;

11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;

12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the
      permission of the court; and

13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal
      record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the
      defendant's compliance with such notification requirement.

AO 245B    (Rev. 12/03) Judgment in a Criminal
    Sheet 3C – Supervised Release

Judgment—Page __4__ of __6__

DEFENDANT:    Joseph Van Sach
CASE NUMBER:    04 CR 466-1

## SPECIAL CONDITIONS OF SUPERVISION

Defendant shall participate in a mental health treatment program at the direction of the probation officer.
Defendant shall participate in a drug aftercare treatment program which may include urine testing at the direction of the
probation officer.
The defendant shall, pursuant to U.S.C. 3583(d), cooperate in the collection of a DNA sample from the defendant, if the
collection of such a sample is authorized, pursuant to Section 3 of the DNA Analysis Backlog Elimination Act of 2000.

245B    (Rev. 12/03) Judgment in a Criminal C
         Sheet 5 — Criminal Monetary Pena

Judgment — Page ___5___ of ___6___

DEFENDANT:          Joseph Van Sach
ASE NUMBER:         04 CR 466-1

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

|        | **Assessment** | **Fine** | **Restitution** |
|--------|----------------|----------|-----------------|
| OTALS  | $  100         | $        | $               |

☐  The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐  The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss* | Restitution Ordered | Priority or Percentage |
|---------------|-------------|---------------------|------------------------|
|               |             |                     |                        |

| **TOTALS** | $ _____ | $ _____ |
|------------|--------------------|--------------------|

☐  Restitution amount ordered pursuant to plea agreement  $ _____

☐  The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐  The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐  the interest requirement is waived for the    ☐  fine   ☐  restitution.

☐  the interest requirement for the    ☐  fine   ☐  restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 12/03) Judgment in a Criminal C
        Sheet 6 -- Schedule of Payments

Judgment — Page ___6___ of ___6___

DEFENDANT:      Joseph Van Sach
CASE NUMBER:    04 CR 466-1

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows:

■    Lump sum payment of $ ___100___ due immediately, balance due

    ☐    not later than _____ , or
    ☐    in accordance    ☐ C,   ☐ D,   ☐ E, or   ☐ F below; or

B    ☐    Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

C    ☐    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D    ☐    Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

E    ☐    Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F    ☐    Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐    Joint and Several

Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☐    The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

2) Apprendix B:

(8-17-06) 05-2790 Court of Appeals Decision

APPENDIX (1)

# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-2790

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JOSEPH VAN SACH,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CR 466—**Ruben Castillo**, *Judge*.

ARGUED JANUARY 20, 2006—DECIDED AUGUST 17, 2006

Before FLAUM, *Chief Judge*, and BAUER and RIPPLE, *Circuit Judges*.

BAUER, *Circuit Judge*. After a jury trial, Joseph Van Sach was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). District Judge Ruben Castillo determined that the Armed Career Criminal Act applied, 18 U.S.C. § 924(e), and therefore, Van Sach's advisory Sentencing Guideline range was 210 to 262 months. Judge Castillo sentenced Van Sach at the bottom of this advisory range, to 210 months in prison. On appeal, Van Sach contends that he was denied due process and a fair trial when the district judge ordered him to wear leg shackles at a jury trial where Van Sach represented himself. In addition, Van Sach argues that he was denied

the right to confrontation because the government declined to call a paid confidential informant as a witness, yet relied on her acts and statements to convict him. Next, Van Sach challenges the jury instructions. Van Sach also argues that 18 U.S.C. § 922(g) is unconstitutional as applied under the Commerce Clause. Finally, Van Sach challenges the application of the Armed Career Criminal Act and the reasonableness of his 210 month sentence. We affirm.

## I. Background

### A. Investigation

The Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") began investigating Joseph Van Sach in 2003. The investigation focused on illegal trafficking of firearms and involved surveillance, the use of a confidential informant, and the controlled purchase of a firearm from Van Sach.

ATF Special Agent Susan Bray testified that the first meeting between the confidential informant ("CI") and Van Sach was on July 14, 2003. Immediately prior to the meeting, Agent Bray searched the CI for contraband, found none, and equipped the CI with a digital recorder. The CI then met with Van Sach for approximately an hour and 45 minutes. Agent Bray and her fellow law enforcement officers conducted continuous surveillance of this meeting.

Agent Bray testified at trial that she retrieved the digital recorder from the CI immediately after the CI met with Van Sach on July 14, 2003, and listened to it. Having heard Van Sach's voice before, Agent Bray was able to identify both Van Sach's and the CI's voices on the tape. She followed this procedure with all the recorded conversations between Van Sach and the CI.

The CI had more in-person meetings with Van Sach on July 16 and July 17, 2003. On July 21, Van Sach and the CI had more serious conversations and they planned to meet

No. 05-2790

3

at Van Sach's apartment that day. The telephone conversations were recorded and Agent Bray met with the CI on the south side of Chicago around 2:30 p.m. Shortly after they met, the CI placed a telephone call to Van Sach to discuss the sale of a firearm. In this call, Van Sach could be heard telling the CI he wanted "$50 for it." Van Sach also described the firearm he was selling as having "ten rounds" and he explained that it was "Teflon."

The CI placed a second phone call to Van Sach at approximately 3:30 p.m. In this recorded conversation, Van Sach again informed the CI that he had numerous firearms he was in a position to sell and that he would need the CI to bring cash that night in order to complete the gun transaction. Agent Bray met with the rest of her team to plan the operation for the CI to purchase a Talon Industries, Inc., Model T200, 9 millimeter semi-automatic pistol from Van Sach that night. The CI, ATF agents, and task force officers from the High Intensity Drug Trafficking Area Unit met at Homan Square, which was near Van Sach's house, to plan the operation. The CI met Agent Bray there and another agent, Ofelia Uribe, searched the CI for any contraband. Uribe did not find any contraband on the CI. The agents then equipped the CI with a digital recorder, transmitter, and $460 in cash to purchase the firearm.

Task Force Officer Dwayne Johnson testified that, while acting in an undercover capacity, he drove the CI to the corner of Cermak and Karlov streets, near Van Sach's house. After the CI left, Officer Johnson conducted surveillance of Van Sach's house. He witnessed the CI walk to the back of Van Sach's house and then come out approximately ten minutes later. As the CI was leaving the house, Officer Johnson saw Van Sach and a woman leave and enter a Chevy Blazer that was parked in the front. Agents Bray and Uribe were also conducting surveillance from a nearby parking lot.

No. 05-2790

4

Once the firearm transaction was complete, the agents and the CI returned to Homan Square. Agent Bray retrieved the digital recording device and searched the CI's handbag. In the CI's handbag Agent Bray found the firearm, which was loaded. She then listened to the recording of the meeting between Van Sach and the CI and she recognized the two voices as belonging to Van Sach and the CI, respectively. The recording was played for the jury and the following conversation was heard:

Van Sach:  I have one 9 here.

CI:  Hand it to me and I'll hand you the money, here you go.

After Van Sach handed the gun to the CI he asked for the gun back in order to wipe it down because he did not "want prints on the gun." The CI did not testify at trial, but the government authenticated the tapes through Agent Bray's testimony.

B.  District Court Proceedings

On May 13, 2004, Van Sach was indicted for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Counsel was appointed for Van Sach. On July 27, 2004, Van Sach's counsel filed a motion to have him evaluated by mental health experts to determine whether he had a diminished capacity defense. Two days later, Van Sach's counsel orally moved to expand his request to include a competency examination. The motion was initially denied without prejudice but was later granted after Van Sach's counsel filed a written motion.

At a status hearing on September 9, 2004, Van Sach said: I understand about the psychiatric thing. When it's all over with, I do not wish to retain this attorney. I wish to represent myself. I know I'm going to be competent

No. 05-2790

5

enough to stand trial, and I just want to represent myself.

Judge Castillo repeatedly warned Van Sach about the risks of self-representation but agreed to take Van Sach's motion to appear *pro se* under advisement. On October 27, 2004, Van Sach again expressed the wish to represent himself. After further admonishment from Judge Castillo, Van Sach requested copies of the case documents to see if he could represent himself. The next day Van Sach's counsel moved to withdraw, citing irreconcilable differences. Van Sach's current attorney was subsequently appointed.

Judge Castillo received several more *pro se* pleadings from Van Sach. At a hearing on February 9, 2005, Van Sach indicated that he was more than capable of trying his own case, but wished to maintain stand-by counsel. Judge Castillo told Van Sach that he had serious concerns about Van Sach proceeding *pro se* but agreed to take the matter under consideration and said he would read Van Sach's evaluation again.

On February 17, 2005, Judge Castillo again admonished and urged Van Sach not to proceed *pro se*. Ultimately, Judge Castillo allowed Van Sach to represent himself with the understanding that if Van Sach tried to obstruct the trial or was running into serious problems with the procedure, Judge Castillo would end Van Sach's right to represent himself and make appointed counsel, Gary Ravitz, proceed with the defense.

Based on court security recommendations, on the first day of trial Judge Castillo ordered Van Sach to appear in leg shackles. Van Sach objected and asked the court to remove the shackles. Judge Castillo denied his request. Because of a security request from the United States Marshal's Service regarding court security, Judge Castillo said he was reluctantly denying Van Sach's motion to remove the shackles in deference to the opinion of the Marshal's Service. After a jury was selected and sent home,

No. 05-2790

6

Judge Castillo stated on the record his reasons for the shackling order:

The Court: Okay. I will state for the record without the jury present now, is that I was shown a series of consistent disciplinary violations in in-custody situations where Mr. Van Sach, in common parlance, has been written up for assaultive [sic] type behavior. And it is consistent and it is a pattern, and that is the reason for the shackling recommendation, which the court has followed.

Van Sach's stand-by counsel argued against the shackling order, asking the Judge to take note that during the day's proceedings Van Sach conducted himself without incident. Judge Castillo added,

The Court: No doubt about that, and I think that that's the way we need to continue to bring this trial to a resolution without any type of incident. But I have the right, as a judge, to rely on professional judgment given to me by the security experts, of which the Court doesn't claim to be a security expert. But there was enough objective evidence, and I don't want to have mini-trials on whether or not these tickets were correct, but there is enough of them over a consistent pattern that seemed to me to justify the recommendation and justify me going along with the recommendation.

Stand-by counsel continued to object, and expressed his concern that the jury might think that Van Sach was an extremely dangerous individual.

No. 05-2790

7

The Court: Well, I think we've gone over it numerous times during jury selection and I have the jurors' words that they will not use it against Mr. Van Sach. And I will tell you there's just—I'm just looking at the disciplinary record. I won't hesitate to put this into the record. There's assault with serious injuries, refusing to obey orders that have led to incidents over and over again. Threatening bodily harm, insolence. It just goes on and on. If you are insistent in looking at it, I'll be happy to show it to you, but I don't think we need to have a mini-trial on this issue.

Van Sach was convicted of being a felon in possession of a firearm. Judge Castillo applied the Armed Career Criminal Act, 18 U.S.C. § 924(e), and determined that the advisory Sentencing Guideline range was 210 to 262 months. Van Sach was sentenced at the low end of this advisory range, to 210 months in prison. This timely appeal followed.

## II. Discussion

### A. Due Process

Van Sach contends that he was denied due process and a fair trial when the district court ordered him to appear in shackles at trial. He argues that his chance for a fair trial was further undermined because he was proceeding *pro se* and the jury therefore saw him in shackles every time he rose to examine a witness or address the jury. A defendant's claim that he was denied a fair trial because the district court ordered him to remain in shackles during the course of the trial is reviewed for abuse of discretion. *Deck v. Missouri*, 544 U.S. 622, 629 (2005).

No. 05-2790

8

A defendant in a criminal case has the right to appear before a jury free from shackles or other physical restraints. *Illinois v. Allen*, 397 U.S. 337, 344 (1970); *Roche v. Davis*, 291 F.3d 473, 482 (7th Cir. 2002). The Supreme Court has recognized, however, that a defendant's right to be free from restraint is not absolute. *Holbrook v. Flynn*, 475 U.S. 560, 567-68 (1986). The right to be free from shackles at trial "may be overcome in a particular instance by essential state interests such as physical security, escape prevention, or courtroom decorum." *Deck*, 544 U.S. at 629.

Van Sach's due process claim is not one we take lightly. Shackling a defendant is an extreme measure and we understand the prejudice that such an order can have on the jury. *Allen*, 397 U.S. at 343-44. Yet, we also understand a trial judge's responsibility to the safety of jurors, attorneys, and witnesses in his or her courtroom. In considering the Marshal Service's request, Judge Castillo reviewed Van Sach's significant disciplinary record at the Metropolitan Correctional Center in Chicago ("MCC").

From August 5, 2004 through January 14, 2005, Van Sach was cited ten times for refusing to obey an order, one time for refusing a work assignment, two times for being insolent to an MCC staff member, one time for threatening bodily harm, and one time for assault without a serious injury. Moreover, in a letter addressed to the district court and dated January 18, 2005 (almost a month before trial), the Acting Warden of the MCC informed the court that the defendant had again been found guilty of refusing to obey an order and the MCC imposed a sanction of 60 days disciplinary segregation, 180 days visiting restriction, and the termination of 27 days of good conduct time. An MCC memorandum from December 8, 2004, is perhaps the most troubling. In the memorandum, a Deputy U.S. Marshal reported that at approximately 9:00 a.m. on December 8, Van Sach was placed in an interview room at the Dirksen Federal Courthouse for a legal visit. Less than 30 seconds

9

after Van Sach's attorney left, Van Sach repeatedly pounded on the door. The marshal told him that he would be removed momentarily and that there was no need to bang on the door. Van Sach told the marshal that he would urinate on the floor if he were not immediately removed from the room. The marshal returned to the room within five minutes to find that the defendant had, in fact, urinated on the floor. At approximately 9:45 a.m., a different marshal came to get Van Sach for his court proceeding. While the marshal was trying to place handcuffs on Van Sach, Van Sach stepped back with his right leg into a stance as if prepared to take an active move on the marshal. After the court proceeding that day, Van Sach was returned to the interview room and he again repeatedly banged on the door. Additionally, he put tissue paper over the window slot to obstruct the marshals' view into the room. A marshal then entered the room to stop Van Sach's behavior and Van Sach told the marshal that if anyone entered the room they would get hurt. The defendant was eventually restrained and returned to the MCC.

In considering the shackling order, Judge Castillo was mindful of the issues that stand-by counsel raised, primarily that with Van Sach appearing *pro se*, Van Sach's leg shackles would be even more visible and audible to the jury than if he was proceeding with counsel. Yet, there was a heightened concern with Van Sach appearing *pro se*: he would be approaching the bench, addressing the jury, examining evidence, using the podium, and approaching witnesses. Judge Castillo believed that the shackling order was necessary in light of both the inherent mobility involved in representing oneself at trial and Van Sach's disciplinary record. We conclude that Judge Castillo carefully assessed the special circumstances involved in Van Sach's trial, as *Deck v. Missouri* requires, 544 U.S. at 629. Judge Castillo went to great lengths to safeguard against any prejudice the jury may have had as a result

10

of the leg shackles. During his initial instructions to the *venire* on the morning of jury selection, the judge informed the panel that defendant's leg shackles were not to be considered at all in terms of whether or not he's guilty or not guilty of the charge. Later that afternoon, Judge Castillo again instructed the *venire* that the defendant's leg shackles were irrelevant to guilt or innocence on the charge. Judge Castillo then asked the jury pool if there was anyone who felt that they would lean towards guilt or innocence based on the leg shackles, and no jurors responded yes. Both the government and Van Sach reminded jurors in their closing arguments that the shackling should play no role in deliberations.

Before shackles are used, *Deck* requires a trial judge to determine that the measure is justified by a state interest specific to the trial. *Id.* In this case, Judge Castillo poured over Van Sach's disciplinary records from the MCC and determined that shackles were a necessary precaution given the defendant's mobility in representing himself at trial. We hold that the district court did not abuse its discretion in requiring Van Sach to wear leg shackles during the trial.

## B. Right to Confrontation

Van Sach next argues that his Sixth Amendment right to confrontation was violated when the government did not call the CI as a witness. Interpretation of the Confrontation Clause of the Sixth Amendment is a legal question that we review *de novo*. *United States v. Sutton*, 337 F.3d 792, 798 (7th Cir. 2003).

In a motion *in limine*, the government explained that it did not intend to call the CI as a witness but it would seek to admit the recordings through Agent Bray's testimony. At trial, the court admitted a series of recorded conversations between Van Sach and the CI. The recordings were made on July 14, July 21, and July 28, 2003. Because

11

of a technical glitch on two of the recordings, only the defendant's side of the conversation with the CI could be heard. On the other recordings, Agent Bray testified that she recognized the voices as belonging to the CI and Van Sach. Judge Castillo specifically instructed the jury, during trial and prior to deliberations, that it was "not to consider the statements of the cooperating individual for the truth of the matter asserted. Instead, the statements made by the confidential informant are only relevant to provide the context for what the listener says, does, or believes in response to them."

When recorded evidence is admitted in the absence of testimony by an informant who recorded the conversation, the Confrontation Clause of the Sixth Amendment is not violated if the statements are non-testimonial and are not offered for the truth of the matter asserted. It is well settled that non-hearsay statements are admissible if they are offered to provide context. *See United States v. Tolliver*, Nos. 05-2910, 05-2962, 2006 U.S. App. WL 2007649, at *4 (7th Cir. July 19, 2006); *United States v. Gajo*, 290 F.3d 922, 930 (7th Cir. 2002); *United States v. Davis*, 890 F.2d 1373, 1380 (7th Cir. 1989).

Van Sach contends that his right to confrontation was violated based on the Supreme Court's recent decision in *Crawford v. Washington*, 541 U.S. 36 (2004). In *Crawford*, the Supreme Court was clear that out-of-court testimonial statements are barred by the Confrontation Clause unless the witnesses are unavailable and the defendant had a prior opportunity for cross-examination. *Id.* at 54. Yet, the Court narrowed its holding to testimonial statements, explaining that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Id.* at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)). Further, the CI's statements were non-testimonial, and thus fall outside of *Crawford*. As we held in *United States v. Tolliver*,

12

statements providing context for other admissible statements are not hearsay because they are not offered for their truth. *Tolliver*, \*3.

In this case, the court gave the jury a limiting instruction, explaining that the CI's statements were only to provide context for the defendant's admissions on the recordings, and could not be used for the truth of the matter asserted therein. Further, while the CI did not testify, the defendant did cross-examine Agent Bray, and indirectly, was able to reach the CI's possible biases. During his cross-examination of Agent Bray, Van Sach elicited testimony that the CI had previously filed assault charges against him, that the CI had received money from the ATF, and that the CI had committed a felony while working for the ATF.

Judge Castillo twice instructed the jury not to consider the CI's statements for their truth, but rather as context for Van Sach's admissions on the tape recording. Since *Crawford*'s prohibition is for testimonial hearsay, *Crawford*, 541 U.S. at 59-60 n. 9, and the declarant's statements here were offered as context evidence rather than for their truth, we conclude that the admission of the CI's statements did not offend the Confrontation Clause.

## C. Jury Instructions

Van Sach also challenges two of the jury instructions given by the district court. He claims the district court's instructions for possession and knowledge were improper and that they had the effect of rewarding the government's failure to call the informant witness. We review a district court's decisions on jury instructions for abuse of discretion. *United States v. Messino*, 382 F.3d 704, 711 (7th Cir. 2004). We review *de novo* whether an instruction accurately summarizes the law or if it is legally erroneous. *United States v. Stewart*, 411 F.3d 825, 827 (7th Cir. 2005).

No. 05-2790

13

Van Sach first challenges the jury instruction for posses-
sion. Judge Castillo gave the following instruction:

Possession of an object is the ability to control it.
Possession exists when an individual holds an object, in
this case a firearm, even if the handling is only momen-
tary, as long as the individual does so knowingly and
intends to handle the object. Possession may also exist
even when a person is not in physical contact with the
object, but knowingly has the power and intention to
exercise direction or control over it, either directly or
through others. A person can possess an object without
owning the object provided that the person has the
power and intention to control the object.

The government's burden in a § 922(g) case includes
proving beyond a reasonable doubt that the defendant
possessed the charged firearm. It is therefore critical that
the district court clearly define the term possession for the
jury.

At the jury instruction conference, stand-by defense
counsel objected to the government's suggested posses-
sion instruction because it was not a verbatim version of the
possession instruction approved by the Seventh Circuit in
*United States v. Hendricks*, 319 F.3d 993, 1004-05 (7th Cir.
2003). Judge Castillo agreed with stand-by defense counsel
and gave the instruction from *Hendricks* instead.

The possession instruction that Judge Castillo gave to the
jury accurately summarized the law in this Circuit and
clearly informed the jury that, in order to convict, it was
required to find that Van Sach knowingly and intentionally
possessed the firearm. Moreover, Judge Castillo modified
the instruction so that it mirrored the posses-
sion instruction preferred by defendant and approved by
this Court in *Hendricks*. The district court did not abuse its
discretion in its use of the possession jury instruction.

No. 05-2790

14

Van Sach also challenges the knowledge instruction.
Judge Castillo gave the following knowledge instruction to
the jury:

When the word "knowingly" is used in these instruc-
tions, it means that the defendant realized what he was
doing and was aware of the nature of his conduct, and
did not act through ignorance, mistake, or accident.
Knowledge may be proved by the defendant's conduct,
and by all the facts and circumstances surrounding the
case.

Van Sach argues that the second sentence of the instruction
should be given only in cases where the evidence presented
at trial was mostly circumstantial. Yet, a significant part of
the government's case against Van Sach was circumstan-
tial. The evidence as it related to possession of the firearm
consisted of tape recordings where Van Sach talked about
the firearm. Further, the surveillance agents' testimony
about their search of the CI and what they found before and
after the firearm transaction was also circumstantial
evidence. We hold that it was not an abuse of discretion for
Judge Castillo to give a knowledge instruction to the jury
that also addressed circumstantial evidence.

No. 05-2790

D. 18 U.S.C. § 922(g)(1)

Van Sach next argues that 18 U.S.C. § 922(g)(1) is
unconstitutional because, in enacting this statute, Congress
exceeded its power under the Commerce Clause. We have
consistently rejected similar Commerce Clause challenges
to § 922(g) since the "jurisdictional element of § 922(g)
provides the required nexus with interstate commerce."
*United States v. Hemmings*, 258 F.3d 587, 594 (7th Cir.
2001); *See, e.g., United States v. Olson*, 408 F.3d 366, 372-73
(7th Cir. 2005); *United States v. Williams*, 410 F.3d 397, 400
(7th Cir. 2005). Moreover, the firearm that Van Sach sold to
the CI satisfied the minimal nexus to interstate commerce

that is required ATF Special Agent Michael Walsh testified that the firearm in question was manufactured in Montana and, thus, it necessarily traveled in interstate commerce prior to Van Sach's possession of it in Illinois. Therefore, Judge Castillo properly denied Van Sach's constitutional challenge to 18 U.S.C. § 922(g)(1).

## E. Sentencing

Finally, we address Van Sach's challenge of the district court's application of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e). Van Sach argues that the district court violated his Sixth Amendment rights because the jury did not determine that his prior convictions were violent felonies beyond a reasonable doubt. He further contends that it was unconstitutional for Judge Castillo to sentence him to a term of imprisonment in excess of the statutory maximum of ten years as provided by 18 U.S.C. § 924(a)(2).[1]

At Van Sach's sentencing hearing the district court concluded that he should be sentenced under ACCA because he had three prior qualifying convictions for violent felonies.[2] As a result, Judge Castillo sentenced him to 210 months' imprisonment.

[1] The statutory maximum prescribed by 18 U.S.C. § 924(a)(2) states that "[w]hoever knowingly violates subsection (a)(6), (d), (g), (h), (i), (j), or (o) of section 922 shall be fined as provided in this title, imprisoned not more than 10 years, or both." Van Sach was convicted of violating 18 U.S.C. § 922(g).

[2] Under 18 U.S.C. § 924(e), "a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years . . . ."

While the Supreme Court has issued several recent opinions clarifying a defendant's Sixth Amendment right to jury findings that increase a defendant's sentence beyond the statutory maximum, the Almendarez-Torres exception has yet to be overruled. Almendarez-Torres v. United States, 523 U.S. 224 (1998). Almendarez-Torres clarified that a trial judge may determine at sentencing whether a prior conviction increases the maximum sentence that may be imposed on a defendant without violating the Sixth Amendment. Id. The Supreme Court's recent Sixth Amendment case law has maintained this holding. See United States v. Booker, 543 U.S. 220 (2005); Blakely v. Washington, 542 U.S. 296 (2004); Ring v. Arizona, 536 U.S. 584 (2002); Apprendi v. New Jersey, 530 U.S. 466 (2000). Van Sach points to Shepard v. United States for support that findings regarding prior convictions should be made by the jury. 544 U.S. 13 (2005). But, Van Sach concedes that we have already decided that the Almendarez-Torres exception for prior convictions still stands after Shepard. See United States v. Browning, 436 F.3d 780, 782 (7th Cir. 2006); United States v. Ngo, 406 F.3d 839, 843 (7th Cir. 2005); United States v. Williams, 410 F.3d 397, 401 (7th Cir. 2005). Shepard itself acknowledges the continuing validity of the Almendarez-Torres exception. 544 U.S. at 24-26, 37-38. (2005) (plurality and dissenting opinions). Given the state of the law, we conclude that Van Sach's Sixth Amendment rights were not violated when Judge Castillo determined that Van Sach should be sentenced under ACCA.

Van Sach attacks the district court's findings on his prior convictions a second way. While he stipulated to a prior felony conviction pursuant to Old Chief v. United States, 519 U.S. 172 (1997), and admitted at sentencing that he had a prior state robbery conviction, he contends that he was forced into the stipulation by prosecutors, the case agent, and stand-by counsel. Van Sach also argues that even if the two prior felony convictions he conceded stand,

17

Judge Castillo erred in determining that two other offenses qualified as predicates under ACCA.

Van Sach's claim that he was forced into the stipulation at trial finds no support in the record. When the *Old Chief* stipulation was read in open court to the jury, the government asked defendant if it was so stipulated and he responded, "Yes, sir." With no objection from Van Sach at trial and nothing in the record to suggest coercion or disagreement with the stipulation, we find the district court did not plainly err when it did not present the question of felony convictions to the jury. In *United States v. Lewis*, we explained that a defendant "waive[s] any claim under the Sixth Amendment when he [takes] advantage of *Old Chief* to prevent the jury from learning details about his prior conviction." 405 F.3d 511, 513 (7th Cir. 2005).

The other convictions that Van Sach urges should not be included as ACCA predicate offenses were for aggravated battery, in violation of 720 ILCS 5/12-4(b)(6). The first offense in question occurred on June 14, 1994 and the second occurred on May 3, 1995. Van Sach contends that these prior convictions for aggravated battery are not violent felonies under 18 U.S.C. § 924(e).

In determining whether an offense is eligible for ACCA, the Supreme Court offers guidance for a district court, holding that the court's enquiry is "limited to the terms of a plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." *Shepard v. United States*, 544 U.S. 13, 26 (2005). In this case, Judge Castillo specifically acknowledged these limitations under *Shepard* and confirmed his analysis to the charging documents and plea colloquies from June 14, 1994 and May 3, 1995. After reviewing the documents, Judge Castillo concluded that Van Sach should be sentenced under ACCA

18

because these convictions for aggravated battery against police officers involved a serious potential risk of physical injury to others, and were felony offenses under 18 U.S.C. § 924(e)(2)(B). *See United States v. Hayes*, 919 F.2d 1262, 1266 (7th Cir. 1990) (aggravated battery to a police officer is a violent felony for purposes of ACCA). We therefore hold that the district court properly rejected Van Sach's Sixth Amendment claim and did not err in sentencing him under ACCA.[3]

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.

A true Copy:

Teste:

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

---

[8]  In an additional *pro se* brief, the appellant argued that his conviction should be overturned for insufficient evidence, that the prosecution's closing argument constituted government misconduct, and that his sentence is unconstitutional. These claims are without merit. Additionally, Van Sach claimed that he received substandard medical care during his incarceration. This appeal is not the proper venue to pursue such a claim.

No. 05-2790

3) Apprendix C:

(9-26-06) 05-2790 Court of Appeals "EnBanc" hearing

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

September 26, 2006

**Before**

Hon. Joel M. Flaum, *Chief Judge*

Hon. William J. Bauer, *Circuit Judge*

Hon. Kenneth F. Ripple, *Circuit Judge*

No. 05-2790

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

    *v.*

JOSEPH VAN SACH,
          *Defendant-Appellant.*

Appeal from the United States District
Court for the Northern District of Illinois,
Eastern Division.

No. 04 CR 466

Ruben Castillo,
    *Judge.*

## ORDER

On August 29, 2006, defendant-appellant filed a petition for rehearing with suggestion of *en banc* in connection with the above-referenced case. No judge in active service has requested a vote on the petition for rehearing *en banc* and all of the judges on the original panel have voted to deny rehearing. It is, therefore, ORDERED that the petition for rehearing and suggestion for rehearing *en banc* is DENIED.

4) Apprendix D:

(1-16-07) 06-8344 Writ of Certiorari "DENIED"

# Supreme Court of the United States
## Office of the Clerk
## Washington, DC  20543-0001

**William K. Suter**
Clerk of the Court
(202) 479-3011

January 16, 2007

Mr. Joseph VanSach
Prisoner ID 17041-424
FCI
P.O. Box 5000
Pekin, IL  61555-5000

Re:   Joseph Vansach
v. United States
No. 06-8344

Dear Mr. VanSach:

The Court today entered the following order in the above-entitled case:

The petition for a writ of certiorari is denied.

Sincerely,

*William K. Suter*

**William K. Suter**, Clerk

5) Apprendix E:

(4-30-07) 06-8344 Writ of Ceriorari Rehearing "Denied"

# Supreme Court of the United States
## Office of the Clerk
## Washington, DC  20543-0001

**William K. Suter**
Clerk of the Court
(202) 479-3011

April 30, 2007

Mr. Joseph VanSach
Prisoner ID 17041-424
FCI
P.O. Box 5000
Pekin, IL  61555-5000

     Re:  Joseph Vansach
           v. United States
           No. 06-8344

Dear Mr. VanSach:

    The Court today entered the following order in the above-entitled case:

    The petition for rehearing is denied.

                Sincerely,

                *William K. Suter*

                **William K. Suter**, Clerk

6) Apprendix F:

(5-13-04) Original Indictment

MAY 1 3 2004

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE CASTILLO

MAGISTRATE JUDGE BOERICK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 04 CR 466 |
| v. | ) | Violations: Title 18, United States Code, |
| | ) | Sections 922(g)(1) and 924(e) |
| JOSEPH VAN SACH | ) | |

The SPECIAL NOVEMBER 2002 GRAND JURY charges:

On or about July 21, 2003, at Chicago, in the Northern District of Illinois, Eastern

Division,

JOSEPH VAN SACH,

defendant herein, having previously been convicted of a crime punishable by imprisonment for a

term exceeding one year, knowingly did possess a firearm, namely, a Talon Industries, Inc.,

Model T200, 9 millimeter semi-automatic pistol, serial number 05936, which firearm had been

transported in interstate commerce;

In violation of Title 18, United States Code, Section 922(g)(1); and

JOSEPH VAN SACH,

at the time he possessed this firearm, had at least three previous convictions for violent felonies

committed on occasions different from one another;

In violation of Title 18, United States Code, Section 924(e)(1).


A TRUE BILL:


_____

FOREPERSON


_____

UNITED STATES ATTORNEY

7) Apprendix G.

(12-15-05) Superseding Indictment

DEC 15 2004

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUDGE CASTILLO

MAGISTRATE JUDGE BODRICK

UNITED STATES OF AMERICA          )
                                  )     No. 04 CR 466
          v.                      )     Violations:  Title 18, United States Code,
                                  )     Sections 922(g)(1) and 924(e)(1)
JOSEPH VAN SACH                   )
                                        **SUPERSEDING INDICTMENT**

The SPECIAL MARCH 2004 GRAND JURY charges:

On or about July 21, 2003, at Chicago, in the Northern District of Illinois, Eastern

Division,

JOSEPH VAN SACH,

defendant herein, having previously been convicted of a crime punishable by a term of imprisonment

exceeding one year, knowingly possessed a firearm, namely, a Talon Industries, Inc., Model T200,

9 millimeter semi-automatic pistol, serial number 05936, which firearm was in and affecting

interstate commerce in that the firearm had traveled in interstate commerce prior to the defendant's

possession of the firearm;

In violation of Title 18, United States Code, Sections 922(g)(1) and 924(e)(1).

A TRUE BILL:

_____
FOREPERSON

_____
UNITED STATES ATTORNEY

8) Apprendix H:

(2-25-05) Complete Closing Argument by Mr. Hotaling

closing - government

1  in fact, challenged the accuracy of the transcripts in this

2  case, so it's appropriate to remind you that it is the tapes

3  that control any discrepancies that you may or may not find in

4  this case.

5        And I also want to remind you that the charge in this

6  case relates to July 21st, 2003, and references to other dates

7  are merely to look at the context and to look at the defendant's

8  intent.

9        With that understanding, we will proceed to closing

10 arguments, and it's appropriate also to remind you again, the

11 attorneys' statements are just meant to assist you in evaluating

12 the evidence.  They're not evidence themselves.

13        The Court recognizes Assistant United States Attorney

14 Mr. Hotaling.

15 CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

16        MR. HOTALING:  May it please the Court, Mr. Vansach,

17 Mr. Ravitz, ladies and gentlemen of the jury.

18        On July 21st, 2003, the defendant, Joseph Vansach, a

19 convicted felon, possessed a 9-millimeter handgun at a location

20 at 4149 West Cermak in Chicago.  He possessed the gun, he held

21 the gun, and he sold the gun to a confidential informant for

22 $450.                                              Vouching

23        Now, how do you know this?  Well, yesterday during the

24 course of the trial you had an opportunity to hear the

25 defendant's voice on a number of tapes and a number of CDs that

closing - government

1   you're going to be able to have with you back in the jury room
2   when you begin your deliberations.

3        The case is really that straightforward.  The
4   defendant possessed the gun, that it traveled in interstate  *Lie*
5   commerce on July 21st, 2003, and all of the evidence that you
6   heard yesterday leads to the unavoidable conclusion that the
7   defendant is guilty of the crime of being a felon in possession
8   of a firearm.

9        Before I kind of get into the meat of the evidence
10  that you had a chance to hear yesterday, I want to highlight an
11  instruction that the judge is going to give after all of the
12  arguments is finished in this case, and it's one element -- it
13  is one instruction and it has two different elements to it, or
14  two different parts to it.

15       First the judge is going to instruct you that you can
16  and you should use your common sense when you go back into that
17  room and begin your deliberations.  Now, obviously, you use your
18  common sense, but you can also rely on your own experiences in
19  your own lives when considering that evidence and what it means.

20       And the second part of that instruction is that you're
21  entitled to and you're encouraged to make reasonable inferences
22  from the evidence that you've heard and has been admitted by the
23  judge.

24       Now, I'm highlighting that now because I'm going to
25  come back to it a couple points during the course of my closing

closing - government

1    argument, but I wanted to highlight those kind of two key
2    concepts when you go -- when you start to begin your
3    deliberations, common sense and reasonable inferences.
4           Now, as the judge just mentioned and Mr. Acosta
5    mentioned during his opening statement, the defendant has been
6    charged with the crime of being a felon in possession of a
7    handgun, and that particular crime, before you can find the
8    defendant guilty of that crime, the government has to establish
9    three things beyond a reasonable doubt, and I've prepared a
10   chart that outlines what those three elements are so that it's
11   very clear.
12          First, the government has to establish --
13          THE COURT:  You can move, Mr. Vansach.
14          MR. HOTALING:  -- beyond a reasonable doubt that the
15   defendant has been convicted of a felony.
16          Second, the defendant has to establish -- excuse me --
17   the government has to establish beyond a reasonable doubt that
18   the firearm traveled in interstate commerce; and, third, the
19   government has to establish beyond a reasonable doubt that the
20   defendant knowingly possessed a firearm.
21          Now, again, I mentioned and I want to make sure I
22   stress it now, the government bears the burden of proving each
23   of these elements beyond a reasonable doubt.  The government has
24   done that in this case, but I want to again mention the burden
25   of proof and that it rests with the government.

closing - government

1    So now that we have the elements presented on the
2    chart, why don't we go ahead and start working our way through
3    and what the evidence is that you've heard that addresses each
4    of these three different elements.  Let's start with element
5    number one, the defendant has been convicted of a felony.

6    Yesterday, you heard me read a stipulation, and as the
7    judge is going to instruct you, a stipulation is an agreement
8    between the parties that a particular fact or set of facts is
9    true.  And in that stipulation, the parties, the government and
10   the defendant, agree that prior to July 21st, 2003, the
11   defendant had previously been convicted of a crime punishable by
12   a term of imprisonment exceeding one year.  You'll have that
13   stipulation back with you.  And it's kind of a long-winded,
14   legalistic way of saying the parties, the defendant and the
15   government, have agreed that the defendant has previously been
16   convicted of a felony.  That's what that long-winded phrase
17   punishable by -- a crime punishable by a term exceeding one
18   year.  That's a felony.

19   So what that stipulation represents, ladies and
20   gentlemen, is an agreement that the government has established
21   this first element beyond a reasonable doubt.

22   Let's move on to element number two.  The government
23   has to establish that the firearm traveled in interstate
24   commerce prior to the defendant's possession of it on July 21st,
25   2003.  What it does not mean and what the government does not

closing - government

1  need to establish is that the defendant carried that gun in

2  interstate travel -- in interstate commerce.  All it means is

3  that at some point between the time of its original manufacture

4  and the time when the defendant possessed it in July 2003, at

5  some point in time that gun crossed some state line.

6          Now, what evidence have we heard on that?  Well,

7  you've had an opportunity to hear from ATF Special Agent Mike

8  Walsh who was the last witness that you heard yesterday, and he

9  testified that he had an opportunity to examine the gun that had

10 been recovered by Special Agent Susan Bray from the CI's handbag

11 on July 21st, 2003.

12         He examined the gun and determined that the

13 manufacturer of that gun was a company by the name of Talon

14 Industries.  And Talon Industries, based on his research, only

15 manufactured firearms in the state of Montana.  What does that

16 mean?

17         Well, in order for that gun to have arrived and been

18 recovered by Agent Bray on July 21st, 2003 in Illinois, it must

19 have at some point in time traveled across state lines from its

20 place of manufacture in Montana to Illinois.

21         At the end of the day, ladies and gentlemen, I'm not

22 sure that there's really much of a dispute as to the second

23 element.  The defendant didn't cross-examine Agent Walsh.  I

24 think that -- in fact, I'm confident in saying that the

25 government has been able to establish this particular element

closing - government

1  beyond a reasonable doubt.

2         Which, ladies and gentlemen, takes us to element

3  number three.  So let's talk about possession.  <u>The evidence</u>  LIG,

4  <u>that you heard during the course of this trial is overwhelming,</u>  Nobody Said I

5  <u>and it shows convincingly that the defendant on July 21st, 2003</u>  WAS IN possession

6  <u>possessed this firearm.</u>  This is the one that he held in his  of A firearm

7  hand and sold to the CI on July 21st.

8         Now, you've heard recordings, recordings of meetings

9  and phone calls where the defendant and the CI talk about trying

10  to set up this meeting at 4149 West Cermak in order to complete

11  this gun transaction.  And you also had a chance to hear

12  everything that went on in that room in that building at 4149.

13         We're going to talk about that and kind of go through

14  that, but you've heard all of that evidence, and you'll have

15  that evidence when you go back into that jury room.  And that

16  evidence leaves no doubt that the defendant possessed this

17  firearm.

18         So let's start talking about these tapes and these

19  recordings and the things that you've heard.  An issue that very

20  well might come up when the defendant has an opportunity to

21  address you is whether or not is it his voice that you heard on

22  those recordings.  Is it the defendant who's talking about

23  9-millimeter handguns and talking about straps?

24         <u>Of course, it is, ladies and gentlemen.</u> Vouching  How do you

25  know that?  Well, for one, you had an opportunity to hear the

closing - government

1  defendant yesterday in court.  He has a distinctive voice, and
2  you'll be able to go back into that jury room and decide for
3  yourselves whether or not it's the defendant's voice on each of
4  those tapes that you've heard.

5        But putting that aside, in addition to that, you also
6  heard testimony from Special Agent Susan Bray, and what did she
7  tell you?  She told you that before and after the July 21st
8  transaction, she had seen and she had heard the defendant.
9  Specifically she had heard his voice and seen his face both
10  before and after the deal.

11        And based on those things, she was able to
12  definitively identify the voice of the defendant on those tapes
13  and on those recordings.  In fact, at the end of her testimony,
14  she said that she had no doubt that it was the voice of the
15  defendant on the recordings that have been admitted into
16  evidence.

17        Make no mistake about it, ladies and gentlemen.  When
18  you go back into those rooms, I encourage you take the tapes,
19  take the CDs, play them, listen to them.  Listen to them again,
20  but make no mistake about it, that one of the voices that you
21  hear on those tapes is that of the defendant, Joseph Vansach.

22        But when we're talking about voice I.D.s and trying to
23  figure out -- trying to determine whether or not, in fact,
24  that's his voice on there, you have the testimony from Agent
25  Bray, but you can also rely on some other things.  You can rely

*[handwritten annotations in right margin: "LIE", "She NEVER SEEN ME or SPOKE To me Until After May 10th 2004 AND NEVER During or before July 21st 800", "Pg 214 L 17-2"]*

closing - government

1  on the testimony of some of the surveillance agents because what
2  they told you about what they saw on that day corroborates what
3  you heard and what you see on -- what you can hear on the tapes
4  and what you can read in the transcripts.

5          And what do I mean by that?  You heard testimony by
6  Agent Bray, Agent Uribe and Detective Johnson, and they told you
7  about where they were positioned and what they saw in relation
8  to that building at 4149 West Cermak.

9          But one thing I would like to point out and one thing
10  I'd like you to stress when you go back there, I'm using the
11  transcript book that you have and I'm specifically referring to
12  Transcript No. 4.  At one point on page 4, actually let's go to
13  page 3.  You can hear about at line 25, he's yelling to an
14  unidentified woman.  He's saying, "You gotta drive me to go get
15  my tools."

16          The woman says, "Why?"

17          Mr. Vansach says, "Because I need a ride.  I'm going
18  to buy my tools."

19          And then turning to page 4 approximately line 29:

20          "Well, you gonna give me a ride?"

21          "Yeah."

22          Vansach goes, "Let's go, come one."

23          The woman goes, "I need my keys."

24          And then you can hear the voice of the defendant kind
25  of drift away, and the CI leaves the building.  But then right

closing - government

1    after that, you heard testimony from Detective Johnson, he was

2    positioned right outside that building. And what did he tell

3    you? He saw the defendant and a woman come out of the building

4    and get into a car.

5            And where did they go? The defendant went in the

6    passenger's seat. The woman went in the driver's seat. What's

7    going on? The woman is giving Mr. Vansach a ride. You have it

8    here. You can hear it on the tape. You can see it on the

9    transcript, and it matches up exactly with what happened and

10   what the agent saw right outside. It matches up exactly.

11           And along those same lines, you've heard testimony

12   from Agent Bray and Agent Uribe that just a few minutes later,

13   they, too, saw the defendant and this unidentified woman in a

14   blue truck driving down Cermak, turning down an alley and going

15   toward Ogden Avenue. Again, ladies and gentlemen,

16   corroboration. It corroborates.

17           So what does all this mean? It means that you have

18   faith, you can have faith that the tapes are accurate and that

19   they are what they are; but, furthermore, you can have faith

20   that the voice that you hear on these tapes and you see on these

21   transcripts is, in fact, the man who's sitting here in the

22   courtroom today, right over there, the defendant. It's the same

23   person. Make no mistake about it. The man whose voice you hear

24   on those tapes is that of the defendant.

25           So let's get right to it. Let's talk about these

closing - government

1   tapes and what they say and how they show that the defendant

2   possessed that 9-millimeter, this 9-millimeter handgun on July

3   21st.  Let's march our way right through it.

4          I've prepared some excerpts on blow-ups here of just

5   some key portions of the transcripts from each of the different

6   conversations that you heard, and I'd like to start going right

7   through them.

8          Starting with July 14th, 2003, you heard, you had an

9   opportunity to hear three excerpts from an in-person meeting

10  between the CI and the defendant on July 14th, 2003.  And in

11  that conversation, they're talking about the fact the defendant

12  is intending to go down, down someplace in order to buy a number

13  of handguns.

14          MR. VANSACH:  I object.

15          THE COURT:  Okay.  Overruled.  You can proceed.

16          MR. HOTALING:  And that CI was interested in

17  purchasing one of those handguns.

18          It's a pretty interesting thing, ladies and gentlemen.

19  I mean the defendant is posing himself to essentially be a

20  one-man gun shop.  This is a guy who can get you the guns -- if

21  you want a particular gun, this is the guy who can get you that

22  particular gun.  It's kind of scary when you think about it.

23          But let's take a look at actually further on in that

24  transcript and what it shows and what it says.  Right here.

25  Talking about, "I mean it's $500, but it's real decent, like

closing - government

1    a .380 or a 9-millimeter, a cheap one, I want it."

2            The CI says, "I definitely want a decent nine."

3            But what does the defendant say in response to that?

4            "Oh, we'll get a whole bunch of those."

5            What -- why is this particular transcript important,

6    and what does it tell us?  Well, it tells us a couple different

7    things.  First of all, it tells us that the defendant had every

8    intention on selling and possessing that, a 9-millimeter

9    handgun, on July 21st.  A week earlier, they're talking about a

10   9-millimeter.  "I'll get a whole bunch of those," referring back

11   to 9s and .380s.  He had the intention.  He had the desire.  He

12   wanted to do it as early as July 14th.

13           What it also tells you, ladies and gentlemen, is --

14   and I have no idea what Mr. Vansach might say in a couple

15   minutes, but if he somehow wants to argue to you that it was a

16   mistake, that he was in the wrong place at the wrong time, that

17   he had no intention to sell the gun, ladies and gentlemen, this

18   takes that away.  There's -- everything that he says right here

19   takes away any argument about mistake.  He intended to be in

20   that building on July 21st with a gun in hand to sell it.

21           Here it is, ladies and gentlemen, setting the stage

22   for what's going to happen a week later.

23           So let's move on to the day of the deal, July 21st,

24   2003.  You heard at the initial stages of that day, the CI met

25   up with Agent Bray and they placed a number of recorded phone

closing - government

1 | calls to the defendant.

2 | Now, as you know, and it's been mentioned by the judge

3 | and Mr. Vansach a couple times, the first two conversations

4 | contain only the defendant's side of those conversations.

5 | Operator error.  It was a mistake.

6 | But what we do have is the defendant's side on the

7 | first call as well as on the second call.  Let's talk about this

8 | first one.

9 | At the very beginning, Mr. Vansach says, "Hey, listen.

10 | I got something left over that you might want."

11 | What's he talking about?  Well, think back a week

12 | earlier to July 14th, and during that call, the defendant's

13 | telling the CI, I'm making this trip down.  I'm making this trip

14 | down, wherever it is he's going, and I'm going to meet up with

15 | my gun supplier and I'm going to come back with guns for resale.

16 | So a week later when he says, "I got something left

17 | over that you might want, well, earlier on I talked to you about

18 | reasonable inferences.  Here's one of them.  What can we infer?

19 | That when he's talking about something left over, he's talking

20 | about those guns that he supposedly purchased from his supplier

21 | a week earlier, that you might want, and I want 450 for it.

22 | 450.

23 | Why is that significant?  That's the amount of money

24 | that the defendant is requiring the CI pay for that handgun, and

25 | it's the same amount of money that you heard Agent Bray testify

closing - government

1   that she gave to the CI at Homan Park later that afternoon.  She

2   gave -- in fact, Agent Bray testified that she gave $460, $450

3   of it for the gun and $10 extra just to make it look like that

4   when the CI went to meet up with the defendant that she wasn't

5   only carrying the $450 for the deal.

6       So let's move on down.  The second call.  What's going

7   on here?  Again, "I've got it here," and then "The one I got

8   here."  What's the one?  He's talking about this one supposedly

9   that's left over that he wants to sell for $450.

10      Now, what's going on down here?  "Well, come get this

11   one as fast as you can 'cuz I want to get rid of it as fast as

12   possible."  What's going on here?  Ladies and gentlemen, the

13   defendant wants to get rid of the gun that he's got in his

14   possession.  He wants to get rid of the 9-millimeter, and he

15   wants to get rid of it as fast as possible, and that's what this

16   phone call tells you.

17      Now moving on down to the third call, that pattern

18   continues.  "You've got to take it with you."  What?  "You got

19   to take it right now."  What's the "it"?  The "it," ladies and

20   gentlemen, is the gun that he's got.  It's the 9-millimeter that

21   he's about ready to sell to the defendant -- to the CI.  It's

22   all right here.  It's in his own words.  You have all of this

23   evidence.

24      MR. VANSACH:  I object to that.  The third one ain't a

25   phone call, if I remember the transcripts right.  It's a

closing - government

1  recording.

2       THE COURT:  Okay.  Overruled.  It's fair argument, so

3  I'll overrule the objection.  You'll get your chance,

4  Mr. Vansach.

5       MR. HOTALING:  You have this transcript of the

6  recording, and you'll have those back with you, talking about

7  it.  It is the firearm.

8            Now, I want to mention something real briefly right

9  now.  The judge is going to instruct you on a number of points

10 throughout all of the recordings that you're going to have back

11 with you, you're going to hear the CI's voice on those

12 recordings.  The judge is going to instruct you that you cannot

13 consider what the CI says on what we lawyers call substantive

14 evidence or primary evidence in determining the guilt of the

15 defendant.

16       You can only consider the conversations or the

17 statements of the CI as providing a context for what the

18 defendant does or says in response to what the CI says.

19            So you just need to look at -- you know, that's

20 something that the judge is going to explain:  He's going to go

21 into it.  But you don't need to rely and you cannot rely on the

22 CI at all.  You don't need to because the defendant has made so

23 many incriminating statements in all of the recordings that

24 you're going to have when you go back into the jury room.  He

25 says it all, and just rely on what he says.  Listen to his

*Can't Rely on the CI at All*

closing - government

1   voice.  It establishes the possession.

2        So let's move on.  After the phone calls have been

3   completed, they're ready to send the CI into that building at

4   4149 West Cermak.  They meet up at Homan Park.  They do a

5   debrief, and at the same time, Special Agent Bray, Special Agent

6   Uribe, they search the CI.  Now, that's important.  Let me tell

7   you why it's important.

8        It's important because immediately before the CI goes

9   into that building, she's completely searched, and there is no

10  firearm or any other sort of contraband on her person before she

11  walks into that building because she's in the control of the

12  surveillance officers and she's been searched.  So she goes into

13  the building and then she comes out of the building.  And after

14  she comes out of the building, she's taken back to the same

15  location and she's searched again.  And the only thing that was

16  on her when she was searched subsequent was this gun, the

17  9-millimeter.

18        So what does that tell you?  That the only place that

19  she could have gotten that gun was in the building at 4149 West

20  Cermak.

21        So you know that, just on that basis alone.  But you

22  know more than that because you've heard exactly what happened

23  in that building on that day between the CI and the defendant.

24  And let's talk about that.

25        They're actually in the building together face-to-face

closing - government

1   July 21st, 2003.  First part of the conversation, this is
2   Transcript No. 4.  First part, right out of his own words --
3   right out of his own mouth in his own words, "I got one nine
4   here."  What does that mean?  It means 9-millimeter.  It means a
5   9-millimeter handgun.  It means this 9-millimeter handgun.  And
6   he says it, "I got it right here."  He says it again, seconds
7   later.  "One nine here.  I carried it back."

8        And after the deal is done, exchange the money in
9   exchange for the handgun, what does he say?  "Enjoy yourself."
10  "Enjoy yourself."

11        All right.  Let's move on down.  There's more to hear,
12  there's more to see.

13        After he's already handed off the money or he's gotten
14  the money in exchange for the handgun, Mr. Vansach says, "Wait,
15  give me that."  Why is he saying that?  Well, he tells you right
16  down here.  "I don't want prints on this gun."  It's right there
17  for you in black and white, you can hear it on the tapes.  But,
18  again, common sense, inferences.

19        He says, "Wait, give me that back."  He says, "I don't
20  want prints on this gun."  What's he doing?  He took the gun and
21  he wiped it clean for prints.  He doesn't want his prints on the
22  gun.  That's exactly what's going on.  "Give me that back."  "I
23  don't want prints on the gun."

24        There's no doubt about it, ladies and gentlemen.
25  Right here and in this part right here, he has admitted to this

closing - government

1   crime.  It is right there.  Possession.  This is your

2   possession.  I don't want my prints on that gun.  Give me that.

3   I want a nine.  That is possession.

4           In and of itself right there, that's enough to end

5   this case right now, but there's more.  Mr. Vansach continues to

6   talk.  He continues to talk about guns.  And he continues to

7   talk about guns a couple days later on July 24th, 2003.

8           Now, you remember you heard the conversations.  There

9   were five telephone conversations between the defendant and the

10  CI, and the whole point of these subsequent conversations is

11  they wanted to do a second deal.  They wanted to get another gun

12  deal done.  But there was a stumbling block.  There was a

13  hold-up to it, and what was the hold-up?  The fact that the CI

14  didn't want to front the money to the defendant.

15          Now, what does fronting mean?  Fronting means that in

16  this case the CI would have to give her money to the defendant

17  without seeing the merchandise that she expected to get and then

18  trust the defendant that he would bring the gun back to her.

19          Well, the CI goes I don't want to front you money.  So

20  what does he do to try to get over this impasse and to try to

21  make this deal happen?  He specifically refers back to the

22  earlier gun deal on July 21st.  And what do I mean by that?

23  It's right here.

24          Trying to work this deal up, he goes, "It ain't like I

25  didn't bring you.  I showed you the one I had, and I gave it to

closing - government

1 you."  He's trying to get this deal happening by just reminding
2 the CI we already did a deal.  I already gave you a gun.  It all
3 worked out fine before.  Trust me this time.

4 Next phone call, a couple minutes later.  Again, same
5 thing, trying to get over this impasse by referring, referring
6 the CI back to the earlier deal.  Here it is again.  "I can't
7 take you in there with me."  "And then you can take them in your
8 fucking bag like you did last time."  What's the last time?  The
9 last time was July 21st.

10 The bag, as you heard Special Agent Bray testify, she
11 recovered the gun that had been told to her by the CI she had
12 put the gun in her bag, and that's where Agent Bray had
13 recovered it.  He remembered it down to the details, ladies and
14 gentlemen.  He remembers exactly where she put it, and he refers
15 back to it to try to convince her to get a different deal done.

16 Now, as we know and Agent Bray testified, no other
17 deal did in fact happen, but, ladies and gentlemen, again,
18 subsequent to it, he's admitting again this earlier possession
19 in an effort to try to get another deal going.

20 Ladies and gentlemen, the evidence in this case is
21 overwhelming, and it is powerful.  I submit to you that when you
22 go back into that jury room and you consider all the evidence
23 and you play all the tapes and you think about all the testimony
24 that you heard, you're going to come up with only one logical
25 conclusion, and that conclusion is that the defendant, being a

closing - defendant

1 | felon, possessed a firearm on July 21st, 2003. He had the gun

2 | in his hand, he possessed it, and he sold it to the CI for $450.

3 |     So I would ask that you return the only verdict that's

4 | consistent with the evidence that you've seen and heard during

5 | the course of this case, a finding of guilty.

6 |     Thank you.

7 |     THE COURT: Okay. Mr. Vansach, do you need some time?

8 |     MR. VANSACH: Five minutes, please.

9 |     THE COURT: Okay. We will stand in recess, ladies and

10 | gentlemen. I'll give you a chance to get some coffee if you

11 | need to.

12 |     (Recess from 10:20 to 10:40 a.m.)

13 |     THE COURT: Ready, Mr. Vansach?

14 |     MR. VANSACH: Yes, sir.

15 |     THE COURT: Okay.

16 |     (Jury enters courtroom.)

17 |     THE COURT: Okay, please be seated, ladies and

18 | gentlemen. Thanks for your patience during that lunch order

19 | time.

20 |     The Court recognizes Mr. Vansach on behalf of himself.

21 | CLOSING ARGUMENT BY THE DEFENDANT

22 |     MR. VANSACH: Good morning, jury. I appreciate the

23 | chance to get to talk to you for the next few minutes. I'm

24 | going to tell you why I'm innocent under the law, but first let

25 | me thank you for taking time out of your busy lives to be my

9) Apprendix I:

(2-23-05) Agreed Signed Stipulation

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA          )
                                  )
        vs.                       )       No. 04 CR 466
                                  )       Judge Ruben Castillo
JOSEPH VAN SACH                   )

### STIPULATION

It is hereby stipulated and agreed between The UNITED STATES OF AMERICA, by its attorney,

PATRICK J. FITZGERALD, the United States Attorney for the Northern District of Illinois, Eastern Division,

and Assistant United Sates Attorneys, CHRISTOPHER P. HOTALING and SERGIO E. ACOSTA, and

defendant, JOSEPH VAN SACH, and his attorney GARY RAVITZ, that the following facts are and should

be considered by the jury to be true and accurate:

Prior to July 21, 2003, the defendant, Joseph Van Sach, had been convicted of a crime that was

punishable by a term of imprisonment of more than one year.


BY: _____          _____
    CHRISTOPHER P. HOTALING                   JOSEPH VAN SACH
    Assistant U.S. Attorney                   Defendant

    _____          _____
    SERGIO E. ACOSTA                          GARY RAVITZ
    Assistant U.S. Attorney                   Attorney for Defendant

10) Apprendix J:

(2-25-05) Jury Instruction No. 9

The indictment in this case is the formal method of accusing the defendant of an offense and placing the defendant on trial. It is not evidence against the defendant and does not create any inference of guilt.

The defendant is charged with the offense of possessing a firearm after having been previously convicted of a crime punishable by imprisonment for a term exceeding one year.

The defendant has pleaded not guilty to the charge.

GOVERNMENT INSTRUCTION NO. 9

Seventh Circuit Committee (1999) 2.01 (modified)